In the Matter of TRUMP-EQUITABLE FIFTH AVENUE COMPANY, Respondent, v ANTHONY B. GLIEDMAN, Individually and as Commissioner of the Department of Housing Preservation and Development of the City of New York, Appellant.

First Department, May 20, 1982

APPEARANCES OF COUNSEL

*Rochelle M. Corson* of counsel (*Edith I. Spivack* with her on the brief; *Allen G. Schwartz, Corporation Counsel*, attorney), for appellant.

*Daniel S. Greenfeld* of counsel (*Gale G. Moscow* and *Robert J. Kipnees* with him on the brief; *Marshall, Bratter, Greene, Allison & Tucker,* attorneys), for respondent.

OPINION OF THE COURT

FEIN, J.

Petitioner The Trump-Equitable Fifth Avenue Company is a joint venture which owns a parcel of real property located at 721-725 Fifth Avenue in the Borough of Manhattan. Prior to the time petitioner took title to the property, the site was improved with a 12-story structure utilized as a retail department store owned and occupied by Bonwit Teller & Co. (Bonwit). Petitioner demolished the 12-story department store building and is replacing it with Trump Tower, a 59-story structure to consist of 18 floors of retail/commercial/office space to be retained by petitioner, and 38 upper residential floors housing 266 luxury condominium units for which an exemption under section 421-a of the Real Property Tax Law is sought. The remaining three floors are to contain general mechanical equipment. The condominium units are being sold for a total sum of $155 million in prices ranging from $407,000 for the smallest one-bedroom unit and ranging upward to more than $3,150,000 for a triplex apartment. It appears that their sale alone will recoup the costs of redevelopment. Since there will be 18 floors of commercial space as compared with Bonwit's 12 floors, the value of the commercial space will increase by at least 50%.

Petitioner applied to the New York City Department of Housing Preservation and Development (HPD) for a partial tax exemption pursuant to section 421-a. HPD denied this application on the ground that the land had not been "under-utilized" within the meaning of the statute and the HPD regulation. Special Term set aside the denial and directed HPD to grant petitioner an exemption.

Section 421-a of the Real Property Tax Law, initially enacted effective July 6, 1971 (L 1971, ch 1207), and since amended several times, provides for a 10-year declining tax exemption for new or rehabilitated multiple dwellings.

"The statute has a specific and limited purpose: to encourage residential construction." (*Teleon Realty Corp. v*

*City of New York,* 88 Misc 2d 767, 771, mod 68 AD2d 858, affd 50 NY2d 824.) Multiple dwellings, new or rehabilitated, are to be partially exempt from taxes for local purposes, other than assessment for local improvements, during construction and so long as used for dwelling purposes for a period not to exceed 10 years in the aggregate after the taxable status date immediately following the completion thereof. At the time of the application for exemption, subdivision 2 of section 421-a provided in pertinent part: "To be eligible for exemption under this section such construction shall take place on vacant, predominantly vacant or under-utilized land, or on land improved with a non-conforming use". The HPD regulation promulgated under that statute established October 1, 1971 as the critical date on which the property had to have been "vacant, predominantly vacant or under-utilized" in order to be eligible for the tax exemption (HPD Rules and Regulations, § 4, subd [a], par [i]). The tax exemption provided for in the statute is a downward exemption on a sliding scale for a period of 10 years. The issue turns on whether on October 1, 1971 the property was "under-utilized". At that time Bonwit fully occupied the 12-story building on the premises as a functioning department store, one of the foremost in the city, not dissimilar from the nearby Saks-Fifth Avenue and Bergdorf Goodman stores. Bonwit closed in 1979 for construction of the Trump Building and has already reopened around the corner at 4 East 57th Street, a completed part of Trump Tower.

On December 31, 1980, petitioner submitted to the city tax exemption program an application for a tax exemption on a form provided for the purpose. The application was supplemented on request by several communications between March 12 and 18, 1981, detailing the status of the existing structure on the site between 1969 and 1978. On March 20, 1981 HPD rejected the application in a letter of the same date, stating that the documentation provided by petitioner to show alleged under-utilization of the property had failed to demonstrate that the site had a "functionally obsolete non-residential or residential building." Any deterioration was said to be "largely due to deferred maintenance practices."

The term "functionally obsolete" has its source in regulations adopted by HPD as authorized under the statute, as follows:

"Section 4. Site Requirements:

"(a) In order for a new or rehabilitated multiple dwelling to be eligible for tax exemption hereunder, the land upon which it is constructed shall meet the following requirements:

"(i) On October 1, 1971, it shall have been vacant; predominantly vacant or under-utilized land; or land improved with a nonconforming use; * * *

"(b) For the purpose of this section, the following general definitions shall apply: * * *

"(iii) 'Under-utilized' land is land or space which was substantially under-utilized by virtue of the fact that:

"(A) It was improved with a residential building or buildings * * *

"(B) It consists of air rights above * * * property used by the general public, or

"(C) It is occupied by functionally obsolete non-residential or residential buildings."

The authority of the Commissioner of HPD to administer the law authorizing tax exemptions or abatements in New York City and to adopt regulations pursuant thereto (Charter of City of NY, § 1802, subd 7, pars [b], [i]) is not disputed. Section 421-a (subd 3) of the Real Property Tax Law provides in pertinent part as follows: "The local housing agency may promulgate rules and regulations to carry out the provisions of this section, not inconsistent with the provisions hereof".

It is well settled that an administrative agency, in exercising its rule-making power, cannot extend the meaning of the statutory language to cover situations not intended to be embraced within the statute (*Matter of Jones v Berman,* 37 NY2d 42). However, the construction of such statutes and regulations by the agency responsible for their administration should be upheld if not irrational or unreasonable (*Matter of Howard v Wyman,* 28 NY2d 434). We need not concern ourselves with an alleged inconsis-

tency between the regulation and the statute if there is a rational basis for a finding that the site was not under-utilized. Since the case is one where no statutory hearing was required or held, the question is not one of substantial evidence but rather whether HPD was arbitrary and capricious or abused its discretion and acted unreasonably in determining that the site as of October 1, 1971 was not under-utilized. (*Matter of Larkin Co. v Schwab,* 242 NY 330; *Matter of Board of Educ. v Cole,* 176 Misc 509, 510-511; CPLR 7803, subd 3.)

It is plain that the Bonwit site as of October 1, 1971 was not being under-utilized in any ordinary understanding of the term. A substantial specialty-type department store was operating on the land, similar in size and scope to neighboring establishments. The building had been constructed of steel and concrete in 1930. In 1971 it reflected the significant status of its occupant, and was typical of the buildings in the area and their use. It appears that during that year its gross sales exceeded $30 million, comparable to other retail businesses in the area. Although maintenance of the building had apparently been deferred, Bonwit continued in business for nine years, almost until the time the new construction was commenced. As noted, Bonwit reopened immediately, around the corner. Its name was of special value and apparently a clientele for its specialized type of business was available.

■ Since Bonwit was operating a substantial business in 1971, the control date, and continued to do so until 1979, it is hardly reasonable to conclude that the building or even the site was under-utilized as a practical matter. It may be that the store was not as profitable as others in the area. However, this is hardly relevant on the issue of utilization. Profits depend on a myriad of factors. The question of Bonwit's condition in 1971 is subject to many different views. The determination of HPD has a rational basis. It can hardly be found to be arbitrary and capricious.

Under these circumstances, it is unnecessary to consider whether respondent's use of "functionally obsolete" in defining under-utilization amounts to an unwarranted extension of the meaning of the statute.

Tax exemption statutes are required to be strictly construed against the property owner, on whom rests the burden of establishing entitlement to the exemption (*Matter of Schwartzman,* 262 App Div 635, 636, affd 288 NY 568). If the exemption is not plainly expressed, it is not to be presumed (*People ex rel. Young Men's Assn. for Mut. Improvement v Sayles,* 32 App Div 197, 201, affd on opn below 157 NY 677; *People ex rel. Mizpah Lodge No. 518 of Ind. Order of Odd Fellows v Burke,* 228 NY 245, 247-248; see, also, *Emery Air Frgt. Corp. v Tishelman,* 55 NY2d 740). Tax exemption statutes must be strictly construed, and exemption must be denied "unless the purpose of the Legislature to exempt such property indisputably appears." (*County of Herkimer v Village of Herkimer,* 251 App Div 126, 127, affd 279 NY 560.)

It plainly cannot be said that the premises were underutilized on October 1, 1971. As noted, on that critical date the site was fully utilized by Bonwit for retail purposes. Correction of a housing shortage by offering limited tax incentives hardly contemplates the grant of benefits at the most choice, already adequately utilized, location in Manhattan, to create residential apartments at the top end of the luxury scale. The question is not who is right as to under-utilization in a real estate appraisal sense for assessment or condemnation purposes, but rather whether HPD had a rational basis for its determination. It may well be that the site was not occupied for its highest and best use. Petitioner argued that a structure of greater height, more completely utilizing the site, might have been a better utilization. If we accept that view of under-utilization, it would have to be concluded that most sites in Manhattan, and perhaps elsewhere in the city, should also be included within the compass of the statute, because larger or taller buildings might better utilize the space. This would amount, in effect, to a universal tax exemption, hardly consonant with the statutory purpose.

Trump Tower's enormous bulk (760,000 square feet) was achieved by means of multiple zoning variances, including the transfer of air rights and the use of a special Fifth Avenue District (C5-3) zoning bonus given solely for the continued high-quality retail use of Fifth Avenue. This has

nothing to do with encouraging residential housing by means of a tax exemption.

Petitioner's purchase price for the premises has been reported at $10 million, for what has reportedly been described by Donald J. Trump as "the best [site] in all the world." This does not demonstrate under-utilization. It stands admitted that Bonwit's operation in the years between 1971 and 1979 suffered from a variety of problems involving profitability, absentee ownership and management difficulties. However, its continued value for retail use is evidenced by its continuation in business from the control date, October 1, 1971, through 1979 when it was purchased by petitioner.

On the control date there were no major structural violations at the premises. It was fully utilized as a high-quality specialty department store and was competing relatively successfully with equally prestigious quality retail establishments. This could hardly be said to constitute under-utilization.

Much of the evidence considered by Special Term was submitted to the court by petitioner after the determination by HPD. However, it did not invalidate HPD's determination because it did not demonstrate that HPD's determination was arbitrary or capricious or without a rational basis.

■ Petitioner asserts that it was denied the equal protection of the laws because others in similar situations obtained a tax exemption denied to it. It is settled law that broad powers of classification exist in matters of taxation, as long as some reasonable basis exists. (*Carmichael v Southern Coal Co.*, 301 US 495; *Ampco Print.-Advertisers' Offset Corp. v City of New York*, 14 NY2d 11, 24-25.) The fact that physically similar buildings were given a section 421-a tax exemption does not demonstrate a denial of equal protection, nor is it dispositive. The Olympic Tower on Fifth Avenue, referred to by petitioner, was built on the site of the old Best & Co. department store which had been closed for several months before the critical date, whereas Bonwit continued in operation for almost nine years after the critical date. The Galleria, which petitioner refers to as

an allegedly similar building which was granted a section 421-a tax exemption, was erected on the site of small, primarily residential buildings, unlike the Bonwit site, and produced a substantially larger number of residential units, plainly the type of construction intended by the statute and by section 4 (subd [b], par [iii], cl [A]) of the HPD Regulations.

Even if this were not so, in the absence of a clear showing that there was an intention to discriminate, the determination of the taxing authority in a different case is of no avail. A tax need not follow a pattern of rigid uniformity (*Bell's Gap R.R. Co. v Pennsylvania*, 134 US 232, 237). There is no showing that the statute has been applied "with an evil eye and an unequal hand" (*Yick Wo v Hopkins*, 118 US 356, 373-374; *Matter of 303 West 42nd St. Corp. v Klein*, 46 NY2d 686).

█ Petitioner's assertion that it acquired a vested right, because it relied upon a valid promise of a tax exemption, is without merit. Its alleged expectations, based upon the views of the Borough President of Manhattan and a member of a local community board and some other public figures, are not dispositive. These individuals are not shown to have any authority to speak for the city or for HPD, the city's authorized agency, in the matter of determining tax exemptions. Moreover, the tax officer has a right to change his views on the statute or even with regard to a long-standing grant of tax exemption. There is no estoppel under such circumstances (*American Theatre Press v Tax Comm. of State of N.Y.*, 86 AD2d 570). Passage of time creates no vested right in a tax exemption.

HPD's determination was neither unreasonable, arbitrary nor capricious. Accordingly, it is entitled to reinstatement.

In the light of this determination, we do not reach and have not considered whether the submission of additional documentation at Special Term created a triable issue of fact requiring a trial, nor have we considered petitioner's contention that the building is qualified for exemption as a replacement of a nonconforming use within the meaning of section 4 (subd [b], par [iv]) of respondent's regulations.

These points were not raised, and thus not considered, at Special Term (*Port Chester Elec. Constr. Corp. v Atlas,* 40 NY2d 652, 658).

The order, Supreme Court, New York County (BLANGIARDO, J.), entered August 4, 1981 which granted petitioner's application to vacate respondent's determination denying petitioner a Real Property Tax Law (§ 421-a) tax exemption, and directed grant of the exemption "without delay", should be reversed, on the law and the facts, without costs, the determination of the Commissioner for the Department of Housing Preservation and Development of the City of New York should be reinstated, and the petition dismissed.

MARKEWICH, J. P., LUPIANO, BLOOM and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on August 4, 1981, unanimously reversed, on the law and the facts, without costs and without disbursements, the determination of the Commissioner for the Department of Housing Preservation and Development of the City of New York reinstated, and the petition dismissed.