In the Matter of the TRUMP-EQUITABLE FIFTH AVENUE COMPANY, Respondent, v ANTHONY B. GLIEDMAN, Individually and as Commissioner of the Department of Housing Preservation and Development of the City of New York, Appellant.

First Department, January 24, 1984

### APPEARANCES OF COUNSEL

*Milton S. Gould* and *Roy M. Cohn* of counsel (*Saxe, Bacon & Bolan, P. C.*, and *Shea & Gould,* attorneys), for respondent.

*Edith I. Spivack* of counsel (*Gary Schuller* with her on the brief; *Frederick A.O. Schwarz, Jr., Corporation Counsel,* attorney), for appellant.

### OPINION OF THE COURT

ALEXANDER, J.

Once again we are called upon to determine whether the Commissioner of the Department of Housing Preservation and Development properly denied the application of

Trump-Equitable for an exemption from taxation, pursuant to section 421-a of the Real Property Tax Law, of its property located at 57th Street and Fifth Avenue in Manhattan. We hold that the denial of the exemption was neither arbitrary or capricious nor lacking a rational basis and therefore should be upheld.

Petitioner, the Trump-Equitable Fifth Avenue Company (Trump) is a joint venture which owns a parcel of real property located at 721-725 Fifth Avenue in the Borough of Manhattan. Prior to the time Trump took title to the property, the site was improved with a 12-story structure built in 1930, which was utilized as a retail department store, owned and occupied by Bonwit Teller & Co. (Bonwit). Trump demolished the building in 1979 and, thereafter, constructed a 59-story structure. The new building is called Trump Towers and consists of 18 floors of retail and commercial office space, 38 floors of residential space, housing 266 luxury condominuiums (for which the exemption is sought), and 3 floors for mechanical equipment. Bonwit closed during the construction of Trump Towers and has since reopened in the new building at 4 East 57th Street.

On December 31, 1980, Trump applied to the city's Department of Housing Preservation and Development (HPD) for a partial tax exemption pursuant to section 421-a of the Real Property Tax Law. The section provides for certain exemptions for new and rehabilitated multiple dwellings that result from the rehabilitation of an existing nonresidential building. HPD denied the application, determining that the land had not been "under-utilized" as of October 1, 1971, within the meaning of section 421-a. As originally enacted effective July 6, 1971 (L 1971, ch 1207) that section provided in part that "To be eligible for exemption under this section such construction shall take place on vacant, predominantly vacant or under-utilized land, or on land improved with a non-conforming use."[1]

In its Regulation No. 4, promulgated under the statute, HPD established October 1, 1971, as the critical date on

---

[1]. As amended, the applicable section reads: "To be eligible for exemption under this section such construction shall take place on land which, thirty-six months prior to the commencement of such construction, was vacant, predominantly vacant, under-utilized, or improved with a non-conforming use" (L 1981, ch 995, § 1).

which the land had to be vacant, predominantly vacant or under-utilized and defined "under-utilized" as "land or space which was substantially under-utilized by virtue of the fact that * * * [i]t is occupied by functionally obsolete non-residential or residential buildings."

Trump successfully challenged this earlier denial in a CPLR article 78 proceeding. Special Term set aside the determination as arbitrary and capricious and in excess of HPD's authority, holding that the regulation defining "under-utilized" as "functionally obsolete" was invalid as an unwarranted extension of the statute. It directed HPD to grant Trump the requested exemption. This court reversed Special Term and dismissed the petition. We held that HPD's determination had a rational basis and was neither arbitrary, capricious nor an abuse of discretion and found it unnecessary, therefore, to consider whether HPD's use of "functionally obsolete" in defining "under-utilization" constituted an unwarranted extension of the meaning of the statute. We observed that "[s]ince Bonwit was operating a substantial business in 1971, the control date, and continued to do so until 1979, it [was] hardly reasonable to conclude that the building or even the site was under-utilized as a practical matter." (*Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,* 87 AD2d 12, 16, revd 57 NY2d 588.)

The Court of Appeals reversed, holding that we "erred in not vacating an agency determination expressly based upon an administrative regulation clearly inconsistent with the plain words of the governing statute" (57 NY2d 588, 593, *supra*). The court noted (p 594) that while the statute focused on "under-utilization of the land", the regulation focused on "obsoleteness of the buildings". The court pointed out that the "regulation substitutes requirements as preconditions to obtaining the exemption not found in this statute itself. Section 421-a does not require 'substantial' under-utilization, nor does the provision imply that only one specific type of under-utilization may qualify property for the exemption" (*supra,* p 594).

While leaving the proper ascertainment of the meaning of "under-utilized" to the administrative agency, the Court of Appeals observed (at p 595) "that reference to the

statutory terms 'vacant' and 'predominantly vacant' precludes any definition of under-utilization which incorporates a requirement that the subject property hold a structure which is functionally obsolete." In an apparent signal as to an appropriate guideline to be used in ascertaining the meaning of "under-utilized", however, the court made reference to the maxim *noscitur a sociis,* which instructs that "the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it [and] * * * expresses the rule of construction that the words used in a statute are construed in connection with, and their meaning is ascertained with reference to, the words and phrases with which they are associated" (57 NY2d 588, 595, *supra*).

Upon remittitur by the Court of Appeals, the matter was remanded to HPD "for further proceedings in accordance with the [Court's] opinion" (*Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, supra,* p 598).

HPD again denied Trump's application, finding that the Bonwit site was not "under-utilized" within the meaning of section 421-a as of the October 1, 1971 control date.

The agency undertook a review of the materials relating to economic and building conditions that had been submitted on the reapplication. In making this review, the agency also considered the guidelines discussed by the Court of Appeals and examined the legislative history of section 421-a. HPD noted that the memorandum submitted by the city's legislative representative was the only official legislative history. That memorandum stated in part, in its reasons for support, that "[t]he bill could channel tax benefits to areas of the City of New York where the creation of new units would create minimal displacement."

HPD proceeded to analyze the term "under-utilized" as applied to the Bonwit site in the context of the zoning resolution. It found that a comparison of the "actual built floor area ratio" (FAR) of the site (unaugmented by a merger of adjacent lots or air rights) with the "permissible FAR" as of the control date, showed a 11.19 to 18 ratio which meant that the Bonwit building used 66% of the maximum potential FAR. HPD concluded that such use

could not be sustained as under-utilization of the site in the "vacant" or "predominantly vacant" context.

Similarly, the agency concluded that an analysis of the square-foot development potential of the site likewise showed that the Bonwit site was not "under-utilized" in the "vacant" or "predominantly vacant" sense. Without a zoning lot merger the Bonwit site, developed to the maximum degree for residential purposes, could have supported the construction of a 350,046 square foot mixed-use building of which 233,364 square feet could have been residential. Thus, the Bonwit building's 217.687 square feet represented 93% of the maximum potential residential use of that site, unmerged with other zoning lots.

While agreeing that the relationship between the assessed value of the land and the Bonwit building might support a conclusion that the land was not developed to its highest and best use, the agency observed that such was the case with virtually every department store in the Fifth Avenue area. It concluded that if that were the criterion for determining "under-utilization", the limited tax exemption potential would be an incentive to tear down a substantial part of Fifth Avenue, a result hardly consonant with either the Legislature's expressed desire to avoid "displacement" or the continued use of Fifth Avenue for quality retail purposes pursuant to the Fifth Avenue Special Zoning District.[2]

Special Term undertook a *de novo* review of HPD's determination, identified the issue to be resolved as "whether or not the HPD has made a proper ascertainment of the meaning of 'under-utilized' in harmony with and consistent with the plain meaning of the statutory language", and concluded that the Bonwit site was underutilized since, *inter alia,* "[a]s a consequence of [Trump's] new construction, there is now at this site what was the thrust of the legislative enactment, 266 new residential dwellings where before there were none."

---

**2.** It should be noted that the agency was cognizant of the tentative postulation, by the Court of Appeals in the footnote referred to by the dissent. That footnote, however, appears immediately following the court's discussion of the use of the maxim, *noscitur a sociis* as a guide to determining the legislative intent in the use of the words "vacant" or "pre-dominantly vacant". Thus the court's reference to Special Term's formulation of the statutory concept should be read in that context.

This was manifest error. As we previously held, this case does not involve a question of substantial evidence (see *Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,* 87 AD2d 12, *supra*). The issues, and the scope of judicial review is limited to a determination of whether the agency's determination had a rational basis or was arbitrary and capricious and thus was an abuse of discretion. (*Matter of Pell v Board of Educ.,* 34 NY2d 222, 231.)

It is well settled that a court may not substitute its judgment for that of a board or body whose determination is under review unless the determination is arbitrary and unreasonable and constitutes an abuse of discretion. (*Matter of Diocese of Rochester v Planning Bd.,* 1 NY2d 508, 520; 8 Weinstein-Korn-Miller, NY Civ Prac, par 7803.04 *et seq.*) "The arbitrary or capricious test chiefly 'relates to whether a particular action should have been taken or is justified * * * and whether the administrative action is without foundation in fact' * * * Arbitrary action is without sound basis in reason and is generally taken without regard to the facts." (*Matter of Pell v Board of Educ., supra,* p 231.) HPD very carefully examined the issue of the under-utilization of the Bonwit site as of the October 1, 1971 control date in the context of the statutory language and the maxim *noscitur a sociis* as suggested by the Court of Appeals.

It does not appear that Special Term gave like consideration to either the statutory language or to the maxim. In attempting to define under-utilization in "economic" terms Special Term overlooked both the Court of Appeals express rejection of Trump's argument that such an analysis was appropriate, and our prior observation (not diminished in any way by the Court of Appeals reversal of our holding) that "[i]t may well be that the site was not occupied for its highest and best use * * * [However] [i]f we accept that view of under-utilization, it would have to be concluded that most sites in Manhattan, and perhaps elsewhere in the city, should also be included within the compass of the statute, because larger or taller buildings might better utilize the space. This would amount, in effect, to a universal tax exemption, hardly consonant with the statutory purpose." (*Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,* 87 AD2d 12, 17, *supra*.)

We note that although HPD proceeded to evaluate the Trump application under its newly promulgated regulations (eschewing the adjective "substantial" as dictated by the Court of Appeals decision) such analysis was unnecessary since, as the agency correctly indicated, when promulgated, these regulations were intended to apply to applications submitted after their adoption. Inasmuch as this Trump application was then being reviewed by the courts, the new regulations were not intended to apply to the Trump application. Finding, as we do, that the HPD determination as to whether this Bonwit site was under-utilized on October 1, 1971, was appropriate under the statute, we need not reach the question of the appropriateness of the newly promulgated regulations.

The determination of the appellant HPD denying partial tax exemption to Trump pursuant to section 421-a of the Real Property Tax Law was rationally based, represented a rational interpretation of the statutory language "under-utilized" and should not be disturbed.

The order and judgment (one paper) of the Supreme Court, New York County (DAVID H. EDWARDS, JR., J.), entered on July 13, 1983, which granted petitioner's application to vacate and annul respondent's determination denying petitioner a Real Property Tax Law (§ 421-a) tax exemption and directed the grant of partial tax exemption, should be reversed, on the law, without costs, and the determination of the Commissioner of the Department of Housing Preservation and Development of the City of New York reinstated and the petition dismissed.

KUPFERMAN, J. P. (dissenting). I would affirm.

While I cannot fault the Department of Housing Preservation and Development in its dissatisfaction with a statutory exemption that allows luxury accommodations to obtain a tax exemption, the operative langauge in the governing statute is "under-utilized". The conclusion that this prime piece of real estate at the southeast corner of Fifth Avenue at 57th Street was not "under-utilized" can be justified only on the basis that tax benefits of this kind should not have been authorized.

As to the proper objective definition, footnote 4 on page 595 of the Court of Appeals opinion (*Matter of Trump-*

*Equitable Fifth Ave. Co. v Gliedman,* 57 NY2d 588) states as follows: "We would note in this regard that we in no way approve of or adopt Trump's contention that 'under-utilized land' is property not developed to the most productive state or maximum potential permitted under applicable zoning regulations. More appropriate perhaps is Special Term's formulation of the statutory concept as property 'used in such manner that substantially less beneficial use was made of the land than was possible under the circumstances."

Within the "appropriate" definition, it has been shown that the new structures make substantially more beneficial use of the land involved.

SULLIVAN, ROSS and MILONAS, JJ., concur with ALEXANDER, J.; KUPFERMAN, J. P., dissents in an opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on or about July 13, 1983, reversed, on the law, without costs and without disbursements, and the determination of the Commissioner of the Department of Housing Preservation and Development of the City of New York is reinstated and the petition dismissed.