*690 OPINION OF THE COURT
Fuchsberg, J.
In this article 78 proceeding we must define the measure of proof required to make out a prima facie case of unconstitutional discrimination in the administering of admittedly valid laws. We hold that this burden is met and, hence, an evidentiary hearing before a judicial tribunal is mandated whenever one asserting such a violation can demonstrate a reasonable probability of success on the merits of his claim.
Petitioner corporation is the owner of a 12-story, L-shaped office building located at Eighth Avenue and Forty-Second Street in the Times Square area of New York City. In March, 1974, the corporation, in contemplation of a lease negotiated between it and Show-World, Inc., a prospective tenant, applied to the city’s department of buildings for a permit to reconstruct the cellar, first and mezzanine floors to accommodate the tenant’s intended use of these premises to house an "adult” bookstore and two "adult” theatres. Because the renovations were to be confined to the bottommost floors, petitioner was able to take advantage of an expedited procedure whereby only the altered portions and not the entire building required a certificate of occupancy.[1] The department issued the necessary permit in July, 1974.
In April, 1975, while the alterations were in progress, the Manhattan Borough Superintendent of the Department of Buildings notified petitioner’s architect that "the 2nd to 12th floors * * * do not comply with the egress provisions of either the old [1938] code or the new [1968] code, and is [sic] in apparent violation of Par. C26-600.3 of the new code.”[2] Aside from elevators, the building, constructed in 1926 of fireproof steel and concrete, contains a single staircase or fire tower[3] *691 that leads to an exit on 42nd Street for use of all occupants of the building above the mezzanine floor. Since its construction, no fire or safety problems had ever been reported and, despite the department’s review of the adequacy of the building in that regard in 1951 and again in 1963, this was the first hint petitioner had of such a deficiency. Although the superintendent insisted upon the installation of sprinklers in the two exits to the Show-World premises, he served no notice of violation or gave any other indication that the remainder of the building could not continue in status quo. After further revisions in the alteration plans acceptable to the authorities, the renovations in the premises leased to Show-World were completed at a cost of over $200,000 and, in July, 1975, a temporary amended certificate of occupancy was issued.
Between July and October, 1975, however, the department changed its position. These months bore witness to one of the well-publicized periodic efforts by city officials to "clean up” the Times Square area by driving out of business purveyors of sexually explicit material. And, by what petitioner claims was not a coincidence but inspired by the so-called Midtown Task Force which the Mayor had created to engineer his antismut campaign, the commissioner of buildings during this period decided to take a fresh look at the adequacy of the plans in terms of fire safety. He then used that to persuade the Board of Standards and Appeals to issue a modification of both the original and temporary certificates of occupancy so as to order full sprinklerization of the entire building.* **[4]
At the hearing on his application, the commissioner, contending that the fire tower and exit were inadequate means of egress for the tenants of the other 11 floors in the event of a fire, reiterated the superintendent’s objection that this limited exit complied neither with the pre-existing nor the current *692 code requirements. In addition, the commissioner asserted that, while the exits from the Show-World premises conformed to the code, because he believed it possible that smoke could travel throughout the building via a reception window in the lobby, the sprinklers should also be installed in the three floors occupied by Show-World; however, counsel for the commissioner appears later to have abandoned that contention before the board.
For its part, the petitioner protested that the original certificate of occupancy had been issued in 1928 only after objections by the city that at least two stairwells were required had been officially considered and disregarded. Taking the position that it did not seek to avoid making all expenditures necessary to meet its fire safety obligations, and evincing a willingness to make any reasonable accommodation for that purpose, it urged that less expensive alternatives would achieve the same level of protection. In this regard, it asserted that other buildings, similarly constructed, had only been required to undertake partial sprinklering in satisfaction of their nonconformance under section C26-600.3. Full compliance with the commissioner’s order, according to the petitioner, would be confiscatory, costing over $250,000. On top of the $200,000 it had already expended for the renovations fully approved by the city only two months earlier, these costs, petitioner claimed, would push it into bankruptcy.
Alleging that the continued existence of the building’s purportedly inadequate fire exits for 47 years coupled with the superintendent’s recent approval of the Show-World alterations belied any legitimate concern by the department for fire safety, petitioner argued that the code provisions were being discriminatorily enforced against it as part of the crackdown on businesses catering sexually explicit material. But the board did not allow the petitioner to present any evidence in support of its discrimination argument, confining itself instead to the merits of the commissioner’s requested modification. On March 9, 1976, the board granted the commissioner’s application. The commissioner thereupon issued a violation notice requiring the entire building to be sprinklered. This proceeding followed.
Special Term found warrant in the record for the board’s decision and, further, dismissed petitioner’s discriminatory enforcement claim, concluding that petitioner had made no showing that the action was arbitrary, capricious or contrary *693 to law. A divided Appellate Division affirmed by a vote of three to two. We reverse and remit because, on the basis of the showing before Special Term, the decision to dismiss the petitioner without an evidentiary hearing on the claim of discriminatory enforcement constituted an abuse of discretion as a matter of law.
The underlying right, asserted by petitioner is to equal protection of the laws as guaranteed by the 14th Amendment and the New York State Constitution (art I, § 11), one of the governing principles of our society. As enunciated more than a century ago in Yick Wo v Hopkins (118 US 356, 373-374), it forbids a public authority from applying or enforcing an admittedly valid law "with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances”. We have recognized the principle in cases involving the enforcement of the criminal laws (see People v Acme Markets, 37 NY2d 326; People v Goodman, 31 NY2d 262) and the administrative regulation of public health, safety and morals (see Matter of Di Maggio v Brown, 19 NY2d 283; Matter of Bell v New York State Liq. Auth., 48 AD2d 83). To invoke the right successfully, however, both the "unequal hand” and the "evil eye” requirements must be proven — to wit, there must be not only a showing that the law was not applied to others similarly situated but also that the selective application of the law was deliberately based upon an impermissible standard such as race, religion or some other arbitrary classification (Matter of Di Maggio v Brown, supra, pp 290-291; Oyler v Boles, 368 US 448, 456; Snowden v Hughes, 321 US 1, 8).
In particular, in our State, the claim of unequal protection is treated not as an affirmative defense to criminal prosecution or the imposition of a regulatory sanction but rather as a motion to dismiss or quash the official action (People v Goodman, supra, pp 268-269; People v Utica Daw’s Drug Co., 16 AD2d 12, 15-18). And, in its consideration of the merits of such a claim, as it would on a suppression motion, a court must conduct a hearing if, on the papers before it, a strong showing of selective enforcement, invidiously motivated, appears (People v Utica Daw’s Drug Co., supra, pp 16-19).[5]
*694 The theory is that conscious discrimination by public authorities taints the integrity of the legal process to the degree that no court should lend itself to adjudicate the merits of the enforcement action. This, even though the party raising the unequal protection claim may well have been guilty of violating the law (see People v Acme Markets, 37 NY2d 326, supra [violation of Sunday closing law]; Matter of Di Maggio v Brown, 19 NY2d 283, supra [violation of Condon-Wadlin Act forbidding strikes by public employees]; People v Solkoff, 53 Mise 2d 137 [violation of zoning ordinance]). Such a claim, of course, should not result in immunization from a new prosecution when and if the public authorities cure the defects in their enforcement methods. Thus, we see no reason here to prohibit the petitioner from invoking the constitutional right to defeat the commissioner’s enforcement of the building code against it (see English v Town of Huntington, 448 F2d 319, 323 [Friendly, Ch. J.]).
The burden of proving a claim of discriminatory enforcement is a weighty one. Common sense and public policy dictate that it be so. The presumption is that the enforcement of laws is undertaken in good faith and without discrimination (see, e.g., United States v Falk, 479 F2d 616, 620). Moreover, latitude must be accorded authorities charged with making decisions related to legitimate law enforcement interests, at times permitting them to proceed with an unequal hand. For example, it has been held that, in order to bring an appropriate case to test a new regulation or statute, or because of limited manpower or other resource inadequacies, or for the purpose of deterring other potential transgressors, certain violators may be selected for prosecution out of the class of all known violators (see People v Utica Daw’s Drug Co., 16 AD2d 12, 21, supra; Comment, 61 Col L Rev 1103, 1119-1133). Such an enforcement strategy may also permissibly be directed at only serious violations (see English v Town of Huntington, supra, p 323 [enforcement of building and zoning codes only against buildings where fire and sanitary hazards had gone far beyond tolerable limits]) or those occurring in a geographic area where the probability or rate of violations is high (see, generally, Tieger, Police Discretion and Discriminatory Enforcement, 1971 Duke LJ 717). The reasoning goes that these instances of legitimate law enforcement should not be hampered by requiring that a hearing be held every time one *695 subject to a regulatory or criminal penalty feels he has been unfairly singled out.
A mere showing of selective enforcement is, therefore, not enough. As indicated, the disparate impact must be shown as well to have been the product of an "evil eye”. When officials acknowledge uneven enforcement against a class that has been selected for some reason apart from effective regulation, an impermissible animus has been shown (see Betty-June School v Young, 25 Misc 2d 909, 912).
Ordinarily, however, a strong inference of illicit motive will be all that can be expected because admission of intentional discrimination is likely to be rare; law enforcement officials are unlikely to avow that their intent was to practice constitutionally proscribed discrimination. Proof of intent nevertheless may appear from a convincing showing of a grossly disproportionate incidence of nonenforcement against others similarly situated in all relevant respects save for that which furnishes the basis of the claimed discrimination (cf. Gomillion v Lightfoot, 364 US 339; Yick Wo v Hopkins, 118 US 356, supra). For history teaches that it is by no means to be assumed that motive and disproportionality have to be discrete. The more convincing is the demonstration of the "unequal hand” — the grosser the disparity of enforcement and the greater the similarity between those prosecuted and those not prosecuted —the stronger will be the inference of illicit motive, since conscious discrimination may then stand out as the only reasonable explanation for the pattern of enforcement.
Nevertheless, as a practical matter, difficulties in obtaining detailed knowledge of unprosecuted violators in order to meet the burden of demonstrating similarity are likely to be great. Therefore, because the importance of the right to be free from impermissible selective enforcement must be of more than theoretical value, the burden of demonstrating a violation, albeit- heavy, must not be so heavy as to preclude any realistic opportunity for success. "Latitude should be allowed in this complex area of proof’ (People v Walker, 14 NY2d 901, 902).
Consequently, the threshold showing needed to make out a colorable claim must mediate between our reluctance to impugn legitimate law enforcement methods and our desire to safeguard constitutional rights. To establish enough of a case to trigger an evidentiary hearing as of right, a petitioner must show, on the strength of sworn affidavits and other proof supplying factual detail, that he is more likely than not to *696 succeed on the merits. In formulating this test we draw rough guidance from the principles governing the issuance of a preliminary injunction (see, e.g., Siegel, New York Practice, § 328, p 399), since, in essence, the relief sought in petitioner’s claim will enjoin the authorities from enforcing the commissioner’s order against it. Only the meaningful showing to which we have alluded will enable a court to infer the reasonable probability of success (cf. Show-World. Center v Walsh, 438 F Supp 642, 651 ["strong likelihood”]). The interdependence of evidence relating to uneven enforcement and motivation, on which we have already commented, is a factor which, of course, is to be considered when determining whether this standard has been met (cf. United States v Oaks, 508 F2d 1403, 1404; United States v Berrios, 501 F2d 1207, 1209-1210; United States v Falk, 479 F2d 616, 623, supra).
Here petitioner met the test. It is clear that it made a_ prima facie showing of the merits of its assertions that both disparate impact and invidious motive exist. It alleged different treatment based solely on the nature of its tenant Show-World’s business. Although the transcript of the hearing before the board discloses that the commissioner stated that he had "readily available” a list of other buildings against which similar action had been taken, the list actually furnished to petitioner contained but three addresses without further description of any kind. In contrast, as the petitioners point out on the basis of public record, a hearing could very well have disclosed that, in at least 21 other buildings having a single means of egress, less costly partial sprinkerlization was all the commissioner required to provide adequate fire protection (see Black Jack Distrs. v Beame, 433 F Supp 1297, 1301). This evidence of unequal treatment may be all the more compelling because the code section applied against petitioner (§ C26-600.3) vests discretion in the commissioner to formulate remedies for inadequate exit facilities.
Further, the demonstration of illegitimate motive was direct as well as indirect. As previously noted, at approximately the same time that the commissioner requested modification of petitioner’s certificates of occupancy, city officials, and in particular the Mayor’s assistant in charge of the Midtown Task Force, were unabashedly trumpeting: "[d]espite all the constitutional limitations, we stop at nothing when we try to put one of these places out of business.” Consistent with that public statement, petitioner pleads that the Midtown Task *697 Force had directed the department of buildings to strictly enforce the building code in aid of its campaign. However great may have been the city’s frustration at its inability to reduce the number of sex-related businesses (see, generally, Project, 52 NYU L Rev 810, esp p 881, and n 343; pp 894-900; but cf. Lopate, 42d Street You Ain’t No Sodom, NY Times, March 8, 1979), the existence of this motivation could suffice to taint the commissioner’s enforcement of the building regulations (see People v Acme Markets, 37 NY2d 326, 330, supra; People v Tornatore, 46 Misc 2d 908). It requires no indorsement or rejection of the task force’s goals to recognize how readily it could be found that they were in fact unrelated to legitimate fire prevention.
But petitioner did not rest solely on his presentation of the official’s statement to show motive. Despite the fact that the building had been under the department’s active scrutiny for nearly two years in connection with the reconstruction of its lower floors, no action was taken until the antipornography drive was undertaken. More than this, the record indicates that two previous submissions of the building’s plans for department approval of alterations to higher floors — beyond question entailing review of the fire tower and exit facilities— had not generated an unfavorable administrative response. All this could undermine the commissioner’s claimed motivation, suggesting as it does more than the possibility that his finding of unsafe conditions was but a post hoc justification.[6] Of course, at this point we acknowledge that the commissioner may, upon our remitting this matter, establish that his actions were in fact undertaken in good faith or that his full sprinkerlization order was not an unreasonably excessive measure in this context. In fact, it may turn out that the dangers here are of such magnitude that the police power can only be vindicated by nothing short of the drastic cure for which the city presses. At this stage, though, taken as a whole, the nature and quantum of petitioner’s proposed proofs were more than adequate to justify a judicial hearing,[7] all the more so because *698 the alleged discrimination involved the exercise of 1st Amendment rights (cf. United States v Oaks, 508 F2d 1403, supra; United States v Falk, 479 F2d 616, supra).
In sum, petitioner, having been improperly deprived of an opportunity to present and develop additional proof in support of its constitutional claim, should now have the chance to do so. We should, therefore, reverse and remit this matter to Special Term for a hearing on the merits of the discriminatory enforcement issue.

. Subdivision (b) of section C26-121.5 of the Administrative Code of the City of New York provides that if the alteration affects less than 20% of a building taller than three stories, a new certificate of occupancy for the entire building need not be obtained.

. Section C26-600.3 of the Administrative Code provides the commissioner with discretion in determining the appropriate corrective measures that must be implemented where exit facilities do not conform to the code requirements: "Inadequate exits for existing structures. — Every structure existing on the effective date of this code which is not provided with exit facilities as prescribed in this code, and in which the exit facilities are, in the opinion of the commissioner, inadequate for the safety of the occupants, shall be provided with such means of egress or fire protection as the commissioner shall direct.”

. Section D26-1.07 (subd a, par 42) of the Administrative Code defines a fire tower *691 as "a fireproof stair, enclosed in fireproof walls, without access to the building from which it affords egress other than by a fireproof self-closing door opening on a communicating balcony or other outside platform at each floor level.”

. The commissioner acted pursuant to section 1804 (subd [4], par [c], cl [6]) of the New York City Charter, which provides: "no order, direction or requirement affecting or at variance with any matter set forth in any certificate of occupancy shall be made or issued by any agency or officer of the city * * * unless and until the certificate is set aside, vacated or modified by the board of standards and appeals or a court of competent jurisdiction upon the application of the agency, department, commission, or officer or member thereof, seeking to make or issue such order, direction or requirement. All such applications shall be made in writing and filed with the board or court for hearing thereon”.

. The hearing accorded petitioner before the board, as we have noted, did not consider the merits of the discrimination claim. Such an argument was properly brought only before a judicial tribunal (see Matter of Di Maggio v Brown, supra, p 292).

. Judicial notice may be taken of certain events subsequent to Special Term’s decision that may bear on the discrimination claim. Thus, we observe that in March, 1977 the commissioner issued a vacate order against the entire building but enforced it only against Show-World, which had two sprinklered exits, despite the claimed inadequacy of the fire tower that served the other 11 floors.

. As indicated earlier, the Board of Standards and Appeals granted the commissioner’s request for modification of the petitioner’s certificates of occupancy. It was only thereafter that the commissioner could issue his full sprinklerization order. In *698 any event, the board’s determination countenanced the fact, if not yet the manner, of the discrimination of which the petitioner complains. Petitioner therefore should not be limited, as the penultimate paragraph of the dissent suggests, to an appeal to the very board that had sanctioned the unequal protection. Instead, it was entitled to an impartial evaluation of the action in which the board and the commissioner in effect joined. (See, generally, 3 Davis, Administrative Law Treatise, § 20.07 [exhaustion not required where administrative remedies may be futile]; 1 NY Jur, Administrative Law, § 171, p 575.) And, most significantly, the city itself at no place has raised any exhaustion of remedies point, in recognition, we assume, of the fact that the exahustion rule in any event does not apply where, as here, the challenge to administrative action is on constitutional grounds (Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 57-58).