**Ann RICHARDS, Governor of the State of Texas, et al., Appellants,**

v.

**LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), et al., Appellees.**

No. D–2197.

Supreme Court of Texas.

Oct. 6, 1993.

Rehearing Overruled Feb. 2, 1994.

Javier Aguilar, Houston, Dan Morales, Richard E. Gray, III, Roger Moore, Austin, for appellants.

Albert H. Kauffman, Norma V. Cantu, Guadalupe Luna, Judith A. Sanders–Castro, San Antonio, Donald Branson, Brian Ganson, Brownsville, Susan Brown, San Francisco, CA, Antonia Hernandez, E. Richard Larson, Los Angeles, CA, Yolanda L. Garza, San Benito, John F. Hood, Brownsville, for appellees.

### Opinion

PHILLIPS, Chief Justice.

This class action challenges the constitutionality of the Texas system of higher education [1]. Plaintiffs contend that the policies and practices of defendants, who are State officials and regents of public universities, have denied Mexican Americans who reside in the border area of Texas participation in quality higher education programs and access to equal higher education resources. The trial court rendered a declaratory judgment that the higher education system was unconstitutional under the Texas Constitution and enjoined defendants from giving any force or effect to the higher education appropriation acts of the Texas Legislature. The State perfected a direct appeal to this Court pursuant to TEX.GOV'T.CODE § 22.001(c). We reverse the judgment of the trial court and render judgment in favor of defendants.

### I.

Nine Mexican American organizations and fifteen Mexican American individual plaintiffs filed this action on behalf of a class later certified as follows:

All persons of Mexican—(Hispanic) ancestry who reside in the Border Area consisting of these forty-one contiguous counties along the border in Texas [2] and who are now or will be students at Texas public senior colleges and universities or health related institutions (or who would be or would have been students at Texas public senior colleges and universities or health related institutions were it not for the resource allocation policies and practices complained of in Plaintiffs' petition). This class does not include persons with claims for specific monetary or compensatory relief.

Named as defendants were Ann Richards, Governor of Texas; Dr. Kenneth H. Ashworth, Commissioner of Higher Education; Harry Reasoner, Chair, and each individual member of the Texas Higher Education Coordinating Board (Board); and the chancellors and regents of eleven universities or university systems in Texas. Plaintiffs alleged discrimination in the allocation of resources in undergraduate, graduate, and professional programs to the border area schools. Specifically, they contended that defendants have placed academic programs and physical facilities where they were largely inaccessible to border area residents and have funded the institutions in the border area at lower levels than other institutions. This conduct, they charged, violates article I, sections 3 and 3a and article VII, sections 1 and 10–18 of the Texas Constitution, and TEX.CIV.PRAC. & REM.CODE § 106.001 et seq.

The Reynaldo G. Garza School of Law intervened in the suit, incorporating plaintiffs' contentions and alleging more particularly that the Board, in exercising its responsibility for developing education programs and determining the status of degree-granting institutions, had interfered with the school's degree-granting authority. The school asked that the Board be enjoined from obstructing any plans that might be brought

---

1. The terms "higher education" or "higher learning" are subject to multiple meanings. In its judgment, the trial court defined the "Texas Higher Education System" as "the laws, policies, practices, organizations, entities and programs that have created, developed or maintained Texas public *universities* and *professional schools*," and in the jury charge described the plaintiff class as encompassing students and potential students of "public *senior colleges* and *universities*." (Emphasis added.) As used in this opinion, the *institutions* included by the term "higher education" are limited to state universities, senior colleges and professional schools.

2. The 41–county region, as designated by in plaintiffs' petition, is hereinafter referred to as the "border area." It comprises the following counties: Atascosa, Bee, Bexar, Brewster, Brooks, Cameron, Crockett, Culberson, Dimmit, Duval, Edwards, El Paso, Frio, Hidalgo, Hudspeth, Jeff Davis, Jim Hogg, Jim Wells, Karnes, Kenedy, Kinney, Kleberg, LaSalle, Live Oak, Maverick, McMullen, Medina, Nueces, Pecos, Presidio, Reeves, San Patricio, Starr, Sutton, Terrell, Uvalde, Val Verde, Webb, Willacy, Zapata, and Zavala.

forward by institutions for the development of curricula such as law in the border area.

Although the case was tried to a jury, at the close of evidence the trial court granted plaintiffs' motions for instructed verdict and for uncontroverted fact findings on certain statistical matters. Among these were the following: (1) about 20% of all Texans live in the border area, yet only about 10% of the State funds spent for public universities are spent on public universities in that region; (2) about 54% of the public university students in the border area are Hispanic, as compared to 7% in the rest of Texas; (3) the average public college or university student in the rest of Texas must travel 45 miles from his or her home county to the nearest public university offering a broad range of masters and doctoral programs, but the average border area student must travel 225 miles; (4) only three of the approximately 590 doctoral programs in Texas are at border area universities; (5) about 15% of the Hispanic students from the border area who attend a Texas public university are at a school with a broad range of masters and doctoral programs, as compared to 61% of public university students in the rest of Texas; (6) the physical plant value per capita and number of library volumes per capita for public universities in the border area are approximately one-half of the comparable figures for non-border universities; and (7) these disparities exist against a history of discriminatory treatment of Mexican Americans in the border area (with regard to education and otherwise), and against a present climate of economic disadvantage for border area residents.

Defendants presented uncontroverted evidence that funding of higher education in Texas is currently based on facially neutral formulas. The formulas apply a different multiplier for credit hours taught in various disciplines and at various levels of study. Because of greater equipment needs and a more competitive hiring market for faculty, for instance, science classes have a higher funding rate than English classes. Also, because student-faculty ratios are lower and individual student supervision is more rigorous at the graduate level, masters and doctoral credit hours have a higher multiplier under the formula than do undergraduate courses.

The Board, which was created in 1965 to harmonize the funding requests the Legislature receives each year from the State's colleges and universities, recommends funding to the Legislature based on this formula and the number of students enrolled in the various types of classes at each school during the previous year. The Legislature, which is not a defendant in this suit, then appropriates money to the particular institutions. For several years preceding this suit, the Legislature declined to appropriate the full amount recommended under the formula. Instead, it gave an across-the-board percentage of the formula, supplemented by special item appropriations to particular institutions.

Defendants also presented evidence that the course offerings of the various universities, which result in disparate levels of funding under the formula, are not the product of discrimination against border area schools. After the faculty, administration, and board of regents of a university decide that the school ought to offer a particular program of study, the university submits a proposal to the Board. The Board makes a determination based on need for the program (i.e., duplication of other programs in the State or the particular area, and numbers of graduates of existing programs), cost, and any arrangement the university has made for start-up funding. Since its inception, the Board has approved 93.6% of the programs requested by schools in the border area, compared to only 79.5% of requests from schools in the rest of the State.

The first jury question asked whether each defendant had "treat[ed] Plaintiffs differently, to their detriment, at least in part because Plaintiffs are Mexican Americans, in the process that leads to program approval or allocation of funds for Texas public institutions of higher education." The Texas Higher Education System was defined in the jury charge as "the laws, policies, practices, organizations, entities and programs that have created, developed or maintained Texas public universities and professional schools," and the jurors were instructed that if the Texas

Higher Education System treated plaintiffs differently at least in part because they were Mexican American, then defendants did so for that reason. The jury answered "No" for every defendant, and also found that defendants had not treated the Reynaldo G. Garza School of Law differently.

In answer to other questions, however, the jury did find that: (1) the Legislature had "failed to establish, organize or provide for the maintenance, support or direction of a system of education in which the Plaintiffs have substantially equal access to a 'University of the First Class'"; (2) the Legislature had "failed to make suitable provisions for the support or maintenance of an Efficient System of public universities"; (3) the State could "have reasonably located and developed university programs that provided more equal access to higher educational opportunities to Mexican Americans in the Border Region"; and (4) the Board's policies and practices toward the Reynaldo G. Garza School of Law "impaired the equal availability of legal education to Mexican Americans in South Texas."

Based on the directed verdict, uncontroverted fact findings, and jury verdict, the trial court rendered a declaratory judgment that the Texas Higher Education System violates the Constitution and laws of Texas. The trial court enjoined defendants from giving any force and effect to the sections of the Texas Education Code and the present or future appropriation acts relating to the financing of public universities and professional schools. The trial court stayed its injunction until May 1, 1993, to allow the State time to enact a constitutionally sufficient plan for funding the public universities. This stay was later extended by this Court until final resolution of the appeal. 863 S.W.2d 449 (1993). Defendants bring this direct appeal.

## II.

Article I, § 3, the equal rights clause of the Texas Constitution, provides:

All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

Article I, § 3a provides:

Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative.

TEX.CIV.PRAC. & REM.CODE § 106.001 provides in pertinent part:

[a]n officer or employee of the state or a political subdivision of the state who is acting or purporting to act in an official capacity may not, because of a person's race, religion, color, sex, or national origin: ... (5) refuse to grant a benefit to the person; [or] (6) impose an unreasonable burden on the person.

With regard to these provisions, the trial court held: (1) that the Texas Higher Education System "does not provide to the class that Plaintiffs represent equal rights under the law because of Plaintiffs' Mexican American national origin and discriminates against Plaintiffs and the class they represent because of their Mexican American national origin, in violation of Art. I § 3 of the Texas Constitution, and denies Plaintiffs equal educational opportunity"; (2) that the Texas Higher Education System "has resulted in the expending of less state resources on higher education in geographic areas of significant Mexican American population than in other geographic areas of the state, and thereby denied to Mexican Americans equal rights and equality under the law, in violation of Texas Constitution Arts. I § 3 and I § 3a"; and (3) that the Texas Higher Education System "expends less state resources on higher education in the border area of Texas ... than its population would warrant thereby denying Plaintiffs and the class they represent equal rights and equality under the law guaranteed by the Texas Constitution in violation of Texas Constitution Art. I § 3 and Texas Constitution Art. I § 3a."

As under the Fourteenth Amendment, equal protection challenges under the Texas Constitution are reviewed under a multi-tiered system. Generally, we require only that the classification under challenge be rationally related to a legitimate state

purpose. *Spring Branch Independent School District v. Stamos,* 695 S.W.2d 556, 559 (Tex.1985). The general rule gives way, however, when the classification impinges on the exercise of a fundamental right, or when the classification distinguishes between people, in terms of any right, on a "suspect" basis such as race or national origin. *Id.* In those instances, the state action is subjected to strict scrutiny, requiring that the classification be narrowly tailored to serve a compelling government interest. *See, generally, In re R.L.H.,* 771 S.W.2d 697, 701 (Tex. App.—Austin 1989, writ denied); *Hernandez v. Houston Independent School District,* 558 S.W.2d 121, 123 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.).[3]

A.

It is a necessary initial task—and one of no small difficulty—to decide exactly what classification is challenged in the present case and how that classification is alleged to have been brought about. The trial court's judgment does not identify which defendants are culpable or what parts of the funding or program-approval processes are constitutionally invalid. Instead, it focuses on the outcomes of these processes in the border area, a geographical region that includes both plaintiffs and non-plaintiffs, to conclude that the "Texas Higher Education System" denies plaintiffs equal rights.

To the extent that the trial court's judgment rests on a classification, it thus appears to be a largely geographical one. In seeking to demonstrate racial discrimination, Plaintiffs have created a class, *not* of all Mexican Americans in Texas participating in or desiring to participate in programs of higher education, but a selective category of only those living in a carefully drawn region, labeled the "Border Area." This particular zone was defined solely by plaintiffs and does not constitute a regional designation recognized in the administration of the Texas higher education system.[4] Almost one half of the Mexican Americans in Texas have been omitted from the plaintiff class, since they reside outside the "Border Area." The Houston metropolitan area, for example, which has the highest total Mexican American population of any metropolitan area in the state,[5] is excluded from the defined area. Thus, a more complete class of Mexican Americans would necessarily include many who live in close proximity to major institutions of higher learning.

B.

 If the classification of which plaintiffs complain is indeed based upon geography, they have not shown a violation of equal protection. Both state and federal equality guarantees relate to "equality between persons as such, rather than between areas, and ... territorial uniformity is not a constitutional prerequisite." *McGowan v. Maryland,* 366 U.S. 420, 427, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961); *Mouton v. State,* 627 S.W.2d 765, 767 (Tex.App.—Houston [1st Dist.] 1981, no pet.). This principle has been applied not only to sustain legislation that treats different regions or political subdivisions differently, *see McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393

---

3. Plaintiffs make the same arguments in support of the trial court's holdings that the Texas higher education system violates Tex. Const. art. I, § 3a and Tex.Civ.Prac. & Rem.Code § 106.001 as they do under Article I, § 3. Therefore, we consider their claims under these provisions together.

 Plaintiffs point out that article I, § 3a, the Texas Equal Rights Amendment (ERA), has no federal analogue, and that we have held that it "is more extensive and provides more specific protection than both the United States and Texas due process and equal protection guarantees." *In re Baby McLean,* 725 S.W.2d 696, 698 (Tex. 1987). However, discrimination based upon race or national origin is already subject to strict scrutiny under both federal and state equal protection analysis. Therefore, the Texas ERA

would not afford any additional level of scrutiny in such a case.

4. Although the 41 counties of the border area all have a Mexican American population exceeding forty per cent under the last census, we note that several other counties in the state, not contiguous to the border area, also have a Mexican American population exceeding forty per cent. Census Bureau, Data User Services Division, Census of Population and Housing 1990: Summary Tape File 1 (Feb.1992).

5. *Id.* In oral argument, counsel for plaintiffs characterized Houston, which is in Harris County, as having superior higher educational resources.

(1961); *Salsburg v. Maryland,* 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954), or that confers on subdivisions discretion to adopt or reject a statutory scheme, *see Carl v. South San Antonio Independent School District,* 561 S.W.2d 560 (Tex.Civ.App.—Waco 1978, writ ref'd n.r.e.), but also to defeat claims of equal entitlement to government services. *See, Weber v. City of Sachse,* 591 S.W.2d 563, 567–68 (Tex.Civ.App.—Dallas 1979, writ dism'd).

Therefore, insofar as the judgment in this case purports to find an equal rights violation simply because defendants "expend[ ] less state resources on higher education in the border area of Texas ... than its population would warrant," it cannot be sustained. In this case, if the state has made a geographical classification, defendants need only show that the system of allocating educational resources is rationally related to a legitimate purpose, which they have done under this record. Attempting to ensure that the State's limited higher education budget is wisely and efficiently spent on necessary and non-redundant programs is clearly a legitimate goal, and the State's system for coordinating these requests is a rational means of furthering that purpose.

### C.

Plaintiffs, of course, contend that their classification is primarily one of race or national origin[6] rather than geography. The trial court accepted this argument. Its instructed verdict establishes that the border area of Texas has a significantly higher percentage of Mexican Americans than the rest of the State, and that this general region of the state has been viewed by State policy makers as a Mexican American region. The trial court's first and second equal rights holdings declare that the higher education system discriminates not against residents of a geographical region per se, but against Mexican Americans, and constitutes a violation of the Texas Constitution.

■ Both the federal and Texas constitutions safeguard against invidious discrimination between classes of persons. It is not necessary that the law classify by its terms or that the discrimination be overt. Neutral classifications unevenly applied can violate the constitutional guarantee. *See, e.g., Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886). Also, even a facially neutral law that is applied evenhandedly can be attacked as in substance a device to impose unequal burdens on different classes of persons according to illegitimate criteria. *Cf. Mahone v. Addicks Utility District of Harris County,* 836 F.2d 921, 933 (5th Cir.1988).

Although neutral classifications can be attacked as unconstitutional on the basis of uneven application or unequal burdens, we hold as a matter of law that plaintiffs here have failed to establish that the Texas university system policies and practices are in substance a device to impose unequal burdens on Mexican Americans living in the border region.

■ Before a neutral classification is found to be in fact a racial classification which violates the federal constitutional guarantee of equal protection, a showing of both disproportionate impact and discriminatory intent or purpose is required. "Official action will not be held unconstitutional solely because it results in a racially disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–5, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977), *citing Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *See, Per-*

---

**6.** The Supreme Court has made clear that the Equal Protection Clause protects easily identifiable groups singled out for different treatment under the law and subject to prejudice in the community. *Hernandez v. Texas,* 347 U.S. 475, 478–79, 74 S.Ct. 667, 670–71, 98 L.Ed. 866 (1954). On this basis, it has recognized Mexican Americans as a separate class in various equal protection contexts, and has treated discrimina-
tion against persons of Mexican ancestry as equivalent to racial discrimination. *See Castaneda v. Partida,* 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (discrimination against Mexican Americans in grand jury selection process); *White v. Regester,* 412 U.S. 755, 767–70, 93 S.Ct. 2332, 2340–41, 37 L.Ed.2d 314 (1973) (discrimination against Mexican Americans in legislative reapportionment).

sonnel Administrator of Massachusetts v. Feeny, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); Rogers v. Lodge, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982); Ammons v. Dade City, 783 F.2d 982, 984 (11th Cir.1986).

State courts have not unequivocally interpreted their constitutional equal protection guarantees to require intentional discrimination. Some have relied upon the federal line of cases demanding proof of such intent,[7] while others may suggest that claims alleging unintentional discrimination having a disparate impact on suspect classes will be allowed[8], especially in certain contexts.[9]

Where an intent showing is required, evidence of disparate impact may, in some cases, be so overwhelming and unequivocal as to compel an inference that the challenged policy was driven by a discriminatory purpose. In such a case, the impact evidence alone will be held to establish a prima facie case of discriminatory intent. Washington v. Davis, 426 U.S. at 241, 96 S.Ct. at 2048; Arlington Heights, 429 U.S. at 266, 97 S.Ct. at 563. See, Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), for example, the Supreme Court observed that the redrawing of city boundaries into an irregular twenty-eight-sided figure mandated the conclusion that the purpose of the legislation was to disenfranchise black citizens. Id. at 341, 81 S.Ct. at 127. In other cases where there is no direct evidence of discriminatory purpose, the evidence of impact in conjunction with evidence of other factors, such as foreseeability, legislative and administrative history, knowledge and historical background, may be enough to prove discriminatory purpose. See Arlington Heights, 429 U.S. at 266–68, 97 S.Ct. at 563–65; Ammons v. Dade City, 783 F.2d at 987–88.

▪ In some cases decided under specific civil rights statutes, the Supreme Court has allowed evidence of impact alone to prove a prima facie case of a discriminatory classification. See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Whether, under either the federal or, as plaintiffs argue, the Texas equal protection guarantees, it is ever appropriate to allow evidence of foreseeable disproportionate im-

7. See, e.g., State v. Tookes, 67 Haw. 608, 699 P.2d 983 (1985); People v. Adams, 149 Ill.2d 331, 173 Ill.Dec. 600, 597 N.E.2d 574 (1992); American Federation of State, County and Municipal Employees Local 685, AFL–CIO v. County of Los Angeles, 146 Cal.App.3d 879, 194 Cal.Rptr. 540 (1983). Selective enforcement of regulatory or criminal laws has been held to constitute a denial of state equal protection only upon a showing of a deliberate and intentional plan to discriminate. See State v. Reefer King Co., 559 P.2d 56 (Alaska 1976); Henson v. Department of Law Enforcement, 107 Idaho 19, 684 P.2d 996 (1984); Standard Oil Co. v. Boone Board of Supervisors, 562 S.W.2d 83 (Ky.1978); Aucella v. Town of Winslow, 583 A.2d 215 (Me.1990); Commonwealth v. Franklin Fruit Co., 388 Mass. 228, 446 N.E.2d 63 (1983); State v. Bird Head, 204 Neb. 807, 285 N.W.2d 698 (1979); 303 West 42nd St. Corp. v. Klein, 46 N.Y.2d 686, 416 N.Y.S.2d 219, 389 N.E.2d 815 (1979); Elsaesser v. City of Hamilton Board of Zoning Appeals, 61 Ohio App.3d 641, 573 N.E.2d 733 (1990).

8. See, e.g., Buchanan v. Director of the Division, 393 Mass. 329, 471 N.E.2d 345, 348–49 (1984); Boren v. California Dept. of Employment Development, 59 Cal.App.3d 250, 130 Cal.Rptr. 683, 687 (1976).

9. In the context of public elementary and secondary school education as a fundamental right, see Washakie County School Dist. No. 1 v. Herschler, 606 P.2d 310, 334 (Wyo.1980); Crawford v. Bd. of Education, 17 Cal.3d 280, 295, 130 Cal.Rptr. 724, 734–35, 551 P.2d 28, 38–39 (1976); Serrano v. Priest, 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241, 1254–55 (1971); Horton v. Meskill, 172 Conn. 615, 376 A.2d 359, 374–75 (1977). In the context of zoning as an exercise of the police power, see Southern Burlington County NAACP v. Twp. of Mt. Laurel, 67 N.J. 151, 336 A.2d 713, 716–18, 725 n. 10 (1975), reaffirmed in Southern Burlington County NAACP v. Twp. of Mt. Laurel, 92 N.J. 158, 456 A.2d 390, 414 & n. 4, 415 (1983); In re Twp. of Warren, 132 N.J. 1, 622 A.2d 1257, 1261–62, 1269 (1993).

Although Michigan interprets its state's general equal protection clause consistently with federal doctrine, see, e.g., Doe v. Dept. of Social Services, 439 Mich. 650, 487 N.W.2d 166 (1992), it has held that the anti-discrimination clause in the Michigan state constitution precludes unintentional discrimination that has a disparate impact on the ability of members of suspect classes to exercise their civil rights. NAACP v. City of Dearborn, 173 Mich.App. 602, 434 N.W.2d 444, 449–50 (1989), appeal denied, 433 Mich. 906, 447 N.W.2d 751 (Mich.1989).

pact alone to prove a discriminatory classification is not a question that we must answer in this case.

There is no direct evidence in this case of an intent to discriminate against Mexican Americans in the border area on the part of the defendants. Thus, if intent is required to establish a violation of the Texas equal rights clause, plaintiffs must show a sufficiently high level of disparate impact, either alone or in conjunction with other factors, to raise an inference of intent. They have not done so here. Even if intent is not required under the Texas equal rights clause, the evidence of impact in this case simply does not rise to an adequate level to show discrimination. The inherent flaws that call into question the plaintiffs' alleged classification also fatally weaken the evidence of impact. Whatever the effects of the Texas university system policies and practices, they fall upon *the entire region* and everyone in it, not just upon Mexican Americans within the region. Conversely, they do not fall upon Mexican Americans outside the region. The same decisions that plaintiffs allege show discrimination against Mexican Americans in the border area serve, at the same time, to afford greater benefits to the large number of Mexican Americans who live in metropolitan areas outside the border region.

Furthermore, there is considerable evidence in the record of the Board's efforts to increase educational opportunities for minority students in Texas. Dr. Ashworth testified, for instance, that the Board has developed an Education Opportunities Services Formula for the purpose of putting more money in institutions with high minority enrollments. The formula would give a school $50 per minority student over the first 200. For the three years preceding trial, the Board had recommended that formula to the Legislature, but the Legislature had declined to fund it.[10]

Because we hold that plaintiffs' evidence of impact in this case is insufficient under any standard to prove an equal protection violation, we do not need to consider the effect, in this case, of the jury's finding of no purposeful discrimination or intent. Nor do we need to address plaintiffs' many arguments as to why that finding by the jury is inconsequential.

### D.

■ Plaintiffs nevertheless argue that they are entitled to prevail on this record because higher education should be recognized as a "fundamental right" under the Texas constitution, necessitating strict scrutiny of any law that impinges on the exercise of the right. See *Stamos,* 695 S.W.2d at 559. Fundamental rights "have their genesis in the express and implied protections of personal liberty recognized in federal and state constitutions." *Id.* at 560. The United States Supreme Court has applied heightened scrutiny to laws restricting the right to travel, *Shapiro v. Thompson,* 394 U.S. 618, 627, 629–31, 89 S.Ct. 1322, 1327, 1328–30, 22 L.Ed.2d 600 (1969), the right to vote, *Bullock v. Carter,* 405 U.S. 134, 142–44, 92 S.Ct. 849, 855–57, 31 L.Ed.2d 92 (1972), the right to marry, *Zablocki v. Redhail,* 434 U.S. 374, 383–87, 98 S.Ct. 673, 679–82, 54 L.Ed.2d 618 (1978), and, in a somewhat analogous manner, certain aspects of personal privacy, including a woman's right to terminate a pregnancy. *Roe v. Wade,* 410 U.S. 113, 152–56, 93 S.Ct. 705, 726–29, 35 L.Ed.2d 147 (1973). The Court, however, has expressly declined to include education among that list of fundamental constitutional rights. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 29–39, 93 S.Ct. 1278, 1294–1300, 36 L.Ed.2d 16 (1973). *Rodriguez* was followed in upholding a statute denying tuition-free education to illegal aliens against a challenge that this constituted a breach of the Texas equal protection clauses of both the state and federal constitutions. *See Hernandez,* 558 S.W.2d at 124. However, in *Stout v. Grand Prairie I.S.D.,* 733 S.W.2d 290, 294 (Tex.App.—Dallas 1987, writ ref'd n.r.e.),

---

**10.** During the last session, however, the Legislature did pass the South Texas Initiative, a measure which allocates an additional $460 million to nine border area universities and colleges over four years. The package includes $112 million to improve and expand undergraduate and graduate course offerings, and $348.4 million in tuition revenue bonds for building and expanding campuses and facilities.

*cert. den'd,* 485 U.S. 907, 108 S.Ct. 1082, 99 L.Ed.2d 241 (1988), the court, in another context, asserted that "[p]ublic education is a fundamental right guaranteed by the Texas Constitution."

The only textual basis, either express or implied, asserted by plaintiffs for the fundamental status of higher education under the Texas Constitution is article VII, § 1. As we discuss in Part III, *infra,* the constitutional directive to maintain "an efficient system of public free schools" does not apply to higher education as that term is used in this case. Therefore, plaintiffs' reliance on that language to argue that higher education is a fundamental right secured by the Texas Constitution must fail. We therefore need not reach the issue of how to determine which rights that are guaranteed under the Texas Constitution are to be regarded as fundamental.

### E.

Finally, plaintiffs rely on *United States v. Fordice,* —— U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992), for the proposition that adoption and implementation of race-neutral policies does not alone discharge the State's constitutional duty to eliminate segregated university education, so that lack of discrimination by defendants does not absolve them of a constitutional violation.

Whether to negate the requirement that intent be shown or to advance a different standard of requisite impact to establish an equal protection violation, plaintiffs' reliance on *Fordice* in this context is misplaced. The Supreme Court in *Fordice* assessed Mississippi's steps to dismantle its "prior *de jure* segregated system" of university education. The Court began from the premise that when a state has operated a legally mandated dual education system in violation of the Equal Protection Clause, it does not suffice for the

state simply to abandon the particular laws and policies that are overtly discriminatory and leave in place the system those laws have created. The Court's equal protection decisions dictate that "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation." —— U.S. at ——, 112 S.Ct. at 2735.

■ The duty addressed in *Fordice,* therefore, is a remedial one applicable when the state has operated an educational system in violation of the Equal Protection Clause under *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the duty applies to the vestiges of such *de jure* segregation. Although Texas formerly operated a higher education system in which black students were segregated by law, plaintiffs have not shown that the policies and practices attacked in this suit—*i.e.,* the placement of institutions in regions other than the border area and the allocation of resources to nonborder area schools—are in any way traceable to that *de jure* system of segregation.[11]

Even assuming that the principles articulated in *Fordice* under the United States Constitution apply as well to the Texas Constitution, *Fordice* does *not* stand for the proposition that race-neutral policies can violate the Equal Protection Clause simply because of their discriminatory effects. Indeed, the Court at several points in its opinion took pains to negate any such implication. Citing *Arlington Heights, supra,* which reaffirmed the intent requirement, the Court noted: "Of course, if challenged policies are not rooted in the prior dual system, the question becomes whether the fact of racial separation establishes a new violation of the Fourteenth Amendment under traditional principles." —— U.S. at ——, 112 S.Ct. at 2737 n.

---

**11.** Plaintiffs attempt to invoke *Fordice* by relying on historical discrimination of many forms against Mexican Americans in Texas, rather than on an actual system of legally segregated colleges. Our reading of *Fordice* is that the remedial standards applied in that case are appropriate when the state undertakes to dismantle a system acknowledged or adjudged to be constitutionally invalid, not whenever a broader history of dis-

crimination exists in a state. *Fordice* relaxes the requirement of discriminatory state action because it applies when state actors have *already* violated the Constitution by maintaining separate educational systems. Plaintiffs, however, have not met this initial burden of showing that the Texas higher education system currently denies or formerly denied them equal protection.

6; *see also id.* —— U.S. at ——, at 2738 n. 8 (relaxation of intent requirement applies only to "perpetuation of policies traceable to the prior *de jure* segregative regime").

## III.

■ Article VII, § 1 states:

A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.

The trial court held that this constitutional provision had been violated because "the Legislature, acting through the Defendants, has failed to make suitable provision for the support or maintenance of an efficient system of public universities ... and denied Plaintiffs and the class they represent substantially equal access to Texas public universities and professional schools." We disagree, and hold that article VII, § 1 does not apply to higher education.

In mandating an "efficient system of public free schools," section one of article VII does not specify the number of years of schooling to be provided. Indeed, at the time when this constitutional command was ratified, neither the length of the school year nor the number of years offered was dictated by statute. Schools of no more than seven or eight grades which met for only four or five months a year were common. F.EBY, THE DEVELOPMENT OF EDUCATION IN TEXAS 173, 179, 186 (1925). Not until 1884 did high schools begin to become a part of the standard public school programs. *Id.* at 198. Forty years after ratification of our Constitution, a compulsory school attendance law was enacted, which initially only required attendance for 60 days of the scholastic year for children aged 8 to 10, and exempted those "living more than two and one-half miles by direct and traveled road from the nearest public school...." [12]

In 1927, the Attorney General relied in part upon article VII, § 1 to justify taxes for education beyond the twelve grades; he advised the Legislature of its constitutional power to authorize locally approved taxes to fund junior colleges.[13] Op.Att'y Gen. No. 2663 (To Hon. H.T. Brown, Feb. 14, 1927), 10 TEX.ATT'Y GEN. BIENNIAL REP. 266. In subsequently upholding this authorization under article VII, § 3 we noted:

[T]he position of high schools in the 1870s was somewhat similar to that of the regional junior colleges as developed in this state from 1930 to 1950. The public high school evolved to meet a public need when in the course of American growth and economic development it became necessary and desirable that the average educational level be raised above that of the elementary schools. Junior colleges came into being to fulfill a similar need which became apparent in the twentieth century.

*Shepherd v. San Jacinto Junior College District,* 363 S.W.2d 742, 753 (Tex.1962). In that opinion, we recognized that "it can hardly be supported that the prophetic vision of the convention was so circumscribed that its education conception embraced only a static non-changing educational system". *See id.* at 748 n. 3. Plaintiffs would extend this evolution to include the full gamut of higher education.

The organization of article VII places university education outside of section 1's mandate, however. Sections 1 through 8 are grouped in a subdivision entitled "Public Free Schools." This subdivision of article VII creates permanent and available school funds for the support of the public free schools (sections 2, 5), establishes county school funds (section 6), and authorizes formation of a State Board of Education (section 8). It directs that State tax revenue be set apart for the support of the public free schools, requires the State Board of Education to use a certain amount of this tax revenue "to provide free text books for the use of children attending the public free schools," and permits the collection of additional ad valorem taxes in school districts

**12.** Act of March 13, 1915, 34th Leg., R.S., ch. 49, 1915 TEX.GEN.LAWS 92, §§ 1, 2(d) at 93; F. EBY, *supra.,* at 170.

**13.** This opinion is discussed in *Shepherd v. San Jacinto Junior College District,* 363 S.W.2d 742, 751–52 (Tex.1962).

(section 3). Section 9 is in a separate subdivision entitled "Asylums." It establishes a permanent fund for the maintenance and improvement of the State's asylums. Finally, sections 10 through 18 are in a subdivision entitled "University." This subdivision creates the University of Texas and Texas A & M University (sections 10, 13), creates the permanent and available university funds (sections 11, 11a, 11b), and creates a special higher education fund for institutions not entitled to share in the benefits of the other two university funds (section 17).

It is thus apparent that article VII establishes three separate types of educational institutions supported by separate constitutional funds. The "Public Free Schools" addressed by sections 1 through 8 do not include institutions of higher education.

Plaintiffs counter that nothing in the language of section 1 bars its application to university level education, and that this Court should construe the constitutional guarantee in light of evolving social conditions. The time has long past, they urge, when a high school education can guarantee or even realistically offer full participation in the economic and political life of the State. The connection between a diffusion of knowledge and individual rights that the framers identified and included as the express purpose of section 1 can, plaintiffs argue, only be given effect today by an efficient system of education at all levels.

Plaintiffs' far-reaching argument does violence to the structure of article VII. The State presumably would not only be in violation of the Constitution for its level of funding for border area schools, but also for its operation of the University of Texas, Texas A & M University, and all other public universities that charge tuition. It is difficult to see how the State could carry out the ensuing mandate to operate all of its universities as free schools without abandoning any genuine attempt to provide quality higher education.

Accordingly, we hold that article VII, § 1 does not apply to higher education and,

therefore, this constitutional provision cannot support the trial court's judgment.

## IV.

■ Article VII, § 10 provides:

The Legislature shall as soon as practicable establish, organize and provide for the maintenance, support and direction of a University of the first class, to be located by a vote of the people of this State, and styled, "The University of Texas," for the promotion of literature, and the arts and sciences, including an agricultural and mechanical department.

The trial court held that the Texas higher education system was unconstitutional because "the Legislature, acting through the Defendants, has failed to establish, organize, or provide for the maintenance, support or direction of a system of higher education in which the class represented by Plaintiffs has substantially equal access to a university of the first class in violation of Texas Constitution Art. VII § 1, Art. VII §§ 10–18 and Texas Constitution Art. I § 3 and Art. I § 3a."

Defendants correctly contend that the trial court erroneously found a duty to create a system of higher education in article I, § 10, when in fact the section refers only to the creation of a particular university. The clear language of the section shows that the framers contemplated the founding of a single institution, to be located by the choice of the electorate. The election mandated by section 10 occurred in 1881, and the voters chose Austin as the site of the main campus of that university.[14] Therefore, this portion of the trial court's judgment must also be reversed.

### Conclusion

For the foregoing reasons, we reverse the judgment of the trial court and render judgment in favor of defendants.

---

14. For a general discussion of the history behind the location of the University of Texas, see, e.g., JOE B. FRANTZ, THE FORTY ACRES FOLLIES 7–11 (1983); BERTE R. HAGH, LAND, OIL, AND EDUCATION 1–52 (1986), J.J. LANE, HISTORY OF THE UNIVERSITY OF TEXAS 179–250 (1891); and A SOURCE BOOK RELATING TO THE HISTORY OF THE UNIVERSITY OF TEXAS: LEGISLATIVE, LEGAL, BIOGRAPHICAL, AND STATISTICAL (H.Y. Benedict comp. 1917).