TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






ON MOTION FOR REHEARING








NO. 03-01-00038-CV






Virginia Trevino and Juan Trevino, Appellant



v.



Texas Department of Protective and Regulatory Services, Appellee







FROM THE DISTRICT COURT OF CALDWELL COUNTY, 207TH JUDICIAL DISTRICT


NO. 99-FL-151, HONORABLE GARY L. STEEL, JUDGE PRESIDING







 Appellants Juan and Virginia Trevino both filed motions for rehearing. To answer
certain issues they have raised, we withdraw our opinion and judgment of January 10, 2002, and
substitute this opinion in its place.

 Appellants Juan and Virginia Trevino have four children together, daughters A.T.,
C.A.T., and K.T., and son J.T. At the time of trial, A.T. was nine years' old, C.A.T. was two and
one half, K.T. was about fourteen months, and J.T. was almost seven and one half years' old. 
Virginia has another daughter, J.L., who was thirteen at trial; Juan is not her father. In November
1998, before K.T. was born, it was discovered that C.A.T. had suffered a skull fracture. The Texas
Department of Protective and Regulatory Services (the Department) was called to investigate the
circumstances surrounding C.A.T.'s injury. After Juan and Virginia allegedly violated a 
Department-imposed safety plan in April 1999, the Department removed J.L., A.T., J.T., and C.A.T.
from the Trevinos' custody and filed a petition seeking to terminate the Trevinos' parental rights. 
When K.T. was born in August 1999, she was placed into temporary care and the Department
amended its petition to include her. (1) In October 2000, the cause was presented to a jury, which
found Juan's and Virginia's parental relationships with all four children should be terminated. The
district court signed a decree of termination from which Juan and Virginia appeal.

 Juan contends that section 161.001(1)(O) of the Texas Family Code, allowing for the
termination of parental rights for failure to comply with a court order, is unconstitutionally vague
and overbroad and an unlawful delegation of legislative power to the judiciary. See Tex. Fam. Code
Ann. § 161.001(1)(O) (West Supp. 2002). Juan further contends the evidence was insufficient to
support the verdict.

 Virginia contends that the evidence was legally and factually insufficient to support
termination under sections 161.001(1)(D) or (E) or to support a finding that termination was in the
children's best interest. Id. § 161.001(1)(D), (E) (West Supp. 2002). She further contends the
district court erred in submitting a jury charge on section 161.001(1)(O) and in refusing her requests
for a mistrial.

 Although we find this case extremely close, we hold that the evidence is factually and
legally sufficient to support the jury's verdict and overrule the other issues on appeal.


SUFFICIENCY OF EVIDENCE

 A trial court may terminate a parent-child relationship if it finds (1) that the parent
has engaged in any of the conduct set out as grounds for termination and (2) that termination is in
the child's best interest; the Department must establish these elements by clear and convincing proof. 
Tex. Fam. Code Ann. § 161.001 (West Supp. 2002); Leal v. Texas Dep't of Protective & Regulatory
Servs., 25 S.W.3d 315, 319 (Tex. App.--Austin 2000, no pet.); D.O. v. Texas Dep't of Human
Servs., 851 S.W.2d 351, 352-53 (Tex. App.--Austin 1993, no writ). Clear and convincing evidence
is an intermediate standard of proof falling between the standards of the preponderance of the
evidence and proof beyond a reasonable doubt. Leal, 25 S.W.3d at 319. This heightened standard
of proof does not change the standards by which an appellate court reviews the sufficiency of the
evidence. Id. at 320. We review the legal sufficiency of the evidence by considering only the
evidence and inferences tending to support the finding, disregarding all contrary evidence. Id. at
320-21; D.O., 851 S.W.2d at 353. We will uphold a finding if it is supported by more than a scintilla
of evidence. Leal, 25 S.W.3d at 321. In reviewing factual sufficiency, we view all of the evidence
in a neutral light and set aside a judgment only if the evidence supporting it is so weak or contrary
to the weight of the evidence as to be clearly wrong and unjust. Id.; D.O., 851 S.W.2d at 353. We
will not substitute our judgment for that of the jury. Leal, 25 S.W.3d at 321.

 The jury was asked whether Juan's and Virginia's parental rights should be
terminated under sections 161.001(1)(D), (E), or (O). Sections 161.001(1)(D) and (E) allow for
termination if it is found that the parent (1) "knowingly placed or knowingly allowed the child to
remain in conditions or surroundings which endanger the physical or emotional well-being of the
child" or (2) "engaged in conduct or knowingly placed the child with persons who engaged in
conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann.
§§ 161.001(1)(D), (E). Conduct that "endangers" a child is more than a threat of metaphysical injury
or possible ill effects of an imperfect family environment. Texas Dep't of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); Leal, 25 S.W.3d at 325. However, the conduct need not be
directed at the child or cause the child actual injury; conduct endangers a child if it exposes the child
to loss or injury. Boyd, 727 S.W.2d at 533; Leal, 25 S.W.3d at 325. Section 161.001(1)(O) sets out
as a ground for termination a parent's failure to comply with a court order governing the return of
a child removed by the Department due to abuse or neglect. Tex. Fam. Code Ann. § 161.001(1)(O).

 In a termination case, it is appropriate to submit the controlling issue of whether the
relationship should be terminated to the jury in the form of a broad-form question. Texas Dep't of
Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); In re M.C.M., 57 S.W.3d 27, 32 (Tex.
App.--Houston [1st Dist.] 2001, no pet.). When a broad-form question is submitted, we must
uphold the jury's findings if any ground for termination supports the findings. In re M.C.M., 57
S.W.3d at 32; In re D.L.N., 958 S.W.2d 934, 937 (Tex. App.--Waco 1997, pet. denied).


SUMMARY OF EVIDENCE

 This trial lasted a week and nearly thirty witnesses testified. A summary of the
testimony is necessary to evaluate the sufficiency of the evidence supporting the jury's findings.

 At the time of trial, Juan and Virginia had been married for about ten years. Juan had
done landscaping work in the past, but he testified he had been injured and was receiving worker's
compensation. Juan testified that he and Virginia have four children and that he has two older
daughters who live with their mother in San Antonio; additionally, there are three other children that
might be his. He has been married four times and pays child support for "at least four" children. 
The Department first got involved with the Trevinos in March 1994, when Juan's oldest daughter,
D.T., had bruises all over her body and face. D.T. was sixteen at time of trial. She testified that she
lived with Juan from the time she was three until 1994, when she was about ten and went to live with
her mother. D.T. said when Juan and Virginia became involved, D.T. was about five or six. When
she was six or seven, Juan and Virginia sometimes left her alone to babysit the other children. D.T.
said Juan screamed at her and hit her with his hand, a broom, and a stick. D.T. said Virginia was
present when Juan abused D.T. and never tried to stop the abuse; in fact, D.T. testified that Virginia
sometimes laughed while Juan beat D.T. D.T. said once Juan hit her head against the floor until she
passed out. Photographs were introduced from March 1994 that showed bruises on D.T.'s face,
head, and body inflicted by Juan. D.T. said Juan only hit her and not the other children.

 Juan admitted spanking D.T. when he was frustrated and upset. When asked about
bruises on D.T.'s shoulder, chin, and face, he said she got them falling off a bicycle or because he
"probably hit her by accident" or from his grabbing at her when "[s]he probably tried to escape" from
him. Juan admitted that he hit D.T. on her back with a belt and said he did not know how she got
bruises on her legs. He denied hitting her with anything other than his hand or a belt, and said he
had since learned that he should not hit his children. He also denied banging her head on the floor
and did not recall her passing out.

 D.T.'s sister was fifteen years' old at trial. She testified about one night in 1994 when
she, D.T., and Juan shared a bed. She woke up and felt Juan stroking her legs and stomach, which
felt inappropriate and made her uncomfortable.

 Jaime Ybarra, a Child Protective Specialist with the Department, became involved
with the Trevinos in March 1994, when D.T.'s bruises and injuries were reported. Ybarra testified
that the Department, not the Trevinos, insisted that D.T. see a doctor after she was hurt. The children
were removed from the home due to medical neglect and physical abuse of D.T. Ybarra testified that
the Trevinos initially denied abusing D.T., but then Juan said he had pushed her, causing her to fall
off her bicycle. During therapy a couple months later, Juan admitted that he had physically abused
D.T. The Trevinos told Ybarra that D.T. was a problem child. Ybarra said that D.T. was the only
child abused and that she was "scapegoated" by the Trevinos, meaning she was blamed for things
such as problems in their marriage or with the other children. During some visits, Juan was "very
aggressive towards [D.T.] blaming her for having the children removed."

 Dr. Jeffrey Alvis works at Children's Hospital in Austin. He testified that C.A.T. was
admitted to the hospital for a scalp hematoma and a skull fracture. Dr. Alvis said the Trevinos told
him that C.A.T. was in a babysitter's care when she was injured and that she might have fallen into
a coffee table. Dr. Alvis said he was concerned by that explanation because, "[g]enerally, in cases
where skull fractures or other fractures in children are observed, without any adequate explanation,
we have to be concerned." Dr. Alvis said the fracture could have been caused by a fall or by another
person, but without a "good honest history from the parents," he could not tell the actual cause or
time of injury. After C.A.T. stayed overnight in the hospital and with the Department's approval,
the hospital discharged C.A.T. into Virginia's care. The hospital was instructed that Juan was not
to be around C.A.T. and would have to move out of the house. Dr. Alvis said no other old or healing
fractures were found on C.A.T.

 Bertha Hights testified that she babysat C.A.T. and never let C.A.T. out of her sight. (2) 
When Hights last babysat for C.A.T., she did not see C.A.T. fall or hit her head on anything, did not
hear her cry out in pain, and did not notice any injury to her head. Hights recalled that the Trevinos
called and asked if she knew how C.A.T. got hurt; Juan did most of the talking. Hights told Juan
she did not know anything about it. Hights testified that Juan told her to tell the Department that
C.A.T. might have hurt herself falling on a radio in Hights' house. She also testified that Juan
approached her at church later and told her, "I was coming to let you know that the baby didn't fall
at your house. The baby fell at my house, because I was outside working on my van. And my little
boy came out and told me that the baby had fell."

 Denise Castaneda Ramirez, former Department investigator, testified that she became
involved with the Trevinos on November 10, 1998, when Children's Hospital reported C.A.T.'s
injury. When Ramirez spoke to Virginia away from Juan, Virginia was upset and concerned because
she did not want to lose her children again. Ramirez said Virginia "even went as far as to say that
she didn't think the father did this, but she did not - she wasn't there. And if she had to leave her
husband she would, because she did not want to risk losing her children." After interviewing Juan,
Virginia, and the other children, Ramirez had no logical explanation for how C.A.T. was injured. 
Ramirez said she gathered from Juan's statement that "[t]he only person that had unsupervised
access . . . from the time that the child could have sustained the injury was Mr. Trevino." Therefore,
that night in the hospital Ramirez had Juan and Virginia sign the first safety plan limiting his access
to the children. Juan was required to move out of the family house and was forbidden from having
any contact with the children. 

 Ten days after C.A.T. was admitted to Children's Hospital, Ramirez again talked to
Juan, who offered new explanations for C.A.T.'s injury. Juan now blamed the other children for
C.A.T.'s injury. First, he said their son told Virginia that A.T. had pushed C.A.T. into a wall. Then
he said that on the day C.A.T. was injured, the son told him A.T. had pushed C.A.T. He said he had
not reported this earlier because he was depressed. Juan also told Ramirez that in 1994 D.T. had
bruised herself by falling off a bunk bed. On November 24, Juan and Virginia signed a new safety
plan specifying that Virginia would supervise all contact between Juan and the children.

 Ramirez said Virginia was initially cooperative and very protective of the children. 
As time went on, however, Ramirez became concerned as Virginia began to minimize the incident
and stated that she did not believe that Juan had hurt C.A.T.

 Ramirez interviewed Hights, and according to Ramirez's notes, Hights said that she
babysat C.A.T. on Friday, November 6, and that C.A.T. "could have bumped her head on the floor
or table, but that [Hights] did not see this happen." Hights told Ramirez C.A.T. was not fussy on
Friday, but "maybe it was possible that the child hit something or fell and just did not cry."

 Len Snyder, a police officer in Lockhart, testified that sometime in November 1998,
Juan approached him to discuss the Department's demands that he leave his house. Juan told Snyder
C.A.T. had suffered a head injury but Juan did not know how the injury occurred. Juan said if he
did not leave the house, the children would be removed. Snyder testified that Juan told him that Juan
"was going to take his clothes out of the residence and . . . put them in his car . . . [and] sleep in the
car to make it look like he wasn't at the residence." 

 Donald Cagle, who was eighteen at time of trial, worked with Virginia for about three
months in 1999 and lived in the Trevino home for about a month and a half when he ran away from
foster care. During that time, Cagle said Juan stayed at the house as often as Cagle did. Cagle said,
"They [Juan and Virginia] made many comments that they weren't supposed to be there. They were
very sneaky." Cagle testified that he only heard Virginia tell Juan to leave the house once. Virginia
and J.L. were teasing Juan, who suddenly turned on Virginia as if he was going to hit her. Cagle told
Juan to stop and Virginia told Juan that if he could not take a joke, he should leave. Cagle testified
that there were many times when Juan spent unsupervised time with Virginia's older daughter, J.L. 
On several occasions, the police came to the house and Juan hid in J.L.'s room or in a closet. Cagle
said Juan's worker's compensation claims were fraudulent, that he was not hurt and was capable of
lifting heavy objects. Cagle said he thought Juan was a con man. Cagle also testified that Juan
bragged to him about his sexual relationships with women other than Virginia, including a sixteen-year-old neighbor. Cagle admitted that he had been angry at the Trevinos, but denied that he was
testifying against them for revenge.

 Juan testified about his discovery of C.A.T.'s injury. He said when he picked her up
from Hights' house on Friday, November 6, she was not crying and he did not notice anything wrong
with her. Juan said he became aware of C.A.T.'s injury between about 6:00 and 7:00 that night when
J.L. told him that C.A.T. "had a soft spot on her head." Juan testified that the children were alone
inside the house for about an hour that night while he was outside working on his car with a friend, 
but that he supervised them through a window and "never left their sight just about." Juan said he
had a good view of the room where C.A.T. was in her playpen.

 Juan said he did not take C.A.T. to the hospital immediately because he did not have
transportation and he did not think she had a serious injury. He waited for Virginia to get home and
they brought C.A.T. to a Luling hospital about 9:00 p.m. The hospital sent them home that night and
they returned the next day but were again sent home. On Sunday, November 9, Juan and Virginia
brought C.A.T. to Children's Hospital in Austin, where they learned she had a skull fracture.

 Juan admitted signing the Department safety plans requiring him to move out and
have no unsupervised contact with the children. Juan said he knew that his failure to comply could
lead to further Department involvement. Juan did not recall telling Snyder that he intended to
mislead the Department into thinking he had moved out of the house. Juan said he never took care
of the children while Virginia was at work, but admitted to being in the house when she was not
home. Juan also admitted being with J.L. in violation of a court order. Juan denied asking Hights
to say C.A.T. had fallen while in her care and denied telling her C.A.T. was not injured at her house. 
He said D.T., Hights, Cagle, and another witness had not testified truthfully.

 Gwen Lopez, a Department caseworker, testified her family preservation plan with
the Trevinos consisted of therapy, parenting classes, and home visits. Lopez had more contact with
Virginia than with Juan, partly because he was not always at the home when Lopez visited. In April
1999, Lopez investigated whether Juan was there when Virginia was not present, making numerous
calls to the home. Lopez said that after someone repeatedly picked up and hung up the telephone
without speaking, she went to the house. No one answered the door, but someone peeked out the
window. Lopez waited until Virginia returned, but Virginia would not let Lopez enter the house. 
After Lopez called the police, Virginia admitted Lopez. Lopez interviewed the neighbors and the
next day decided the children should be removed because she believed the safety plan excluding Juan
had been violated.

 Ellen Guckian, a parent educator for the Lockhart schools, testified that initially the
Trevinos participated in her group meetings only sporadically, often arriving late. She said that later
they became more cooperative and attended more regularly. Guckian made several home visits. 
During one visit Virginia was on the phone during most of the time and appeared uninterested in
talking with Guckian. Juan was attentive to the children. Guckian said she did not have a great deal
of experience observing the Trevinos, but she thought Virginia was not very engaged with the
children. Guckian said the Trevinos never accepted that they had any responsibility for the
Department's involvement with the family and often complained about the Department.

 Mary Van Diggele, guardian ad litem for the children, testified that she had been
involved with the case since late June 1999. Van Diggele witnessed several meetings between the
children and the parents after the children were in foster care. She said initially the children were
"clingy" with Juan and Virginia, but that they no longer seemed traumatized when the visits were
over. J.L. acted like a mother to the younger children and Virginia "was rather disassociated from
interaction with her children. She more or less sat back and watched. And [J.L.] assumed, to a
certain extent, the mothering role." Van Diggele has observed the children in their foster home. She
said they were outgoing and interacting normally and did not seem withdrawn or sad. The children
played outside and had friends in the neighborhood. C.A.T. is fearless and "intent on discovering
her world at top speed." She is normal in all aspects except for speech, and is undergoing speech
therapy. Van Diggele said the two youngest children view their foster family as their real parents. 
Van Diggele said the Trevinos consistently blame A.T. for C.A.T.'s injury. Based on her
observations of the children and their interactions with each other, their foster parents, and Juan and
Virginia, Van Diggele recommended that Juan and Virginia's rights be terminated.

 Pastor Benjamin Smith testified that Juan and Virginia had been members of First
Baptist Church in Lockhart for almost two years. On occasion, Virginia asked Smith to watch J.L. 
Smith said Virginia deals with J.L. in a typical mother/daughter way and he believes Virginia is
capable of caring for and protecting her children. He did, however, say there was room for
improvement in Virginia's discipline.

 Taylor Skaar, a counselor with a women's shelter, testified about her work with
Virginia since October 1999. Skaar said one of Virginia's major issues was her anger toward the
Department and a former therapist. Skaar watched Virginia interact with a Department caseworker
and said the caseworker was unprofessional. Skaar believed Virginia's anger toward the Department
was justified and said Virginia had made considerable progress in dealing with that anger. Skaar
said she had never seen anyone more committed to complying with Department requirements than
Virginia. As far as Skaar knew, Virginia attended all classes or events required of her. Skaar
believed Virginia was capable of protecting her children, was "psychologically sound enough to
provide good mothering," and had "expressed deep caring for her children." Skaar did not believe
Virginia was co-dependent on Juan.

 Stanley Harlan provided family counseling to the Trevinos at the Department's
request from February through October 1999. Harlan testified that Virginia was depressed; he
believed she had a long-term depressive disorder stemming from low self-esteem and a sense of
worthlessness. He said the Trevino family was very engaged in the counseling, and Virginia was
cooperative even though she disliked being required to undergo therapy. Harlan said initially
Virginia seemed to have some ambivalence about Juan's involvement in C.A.T.'s injury. She did
not think he had hurt the child, but was open to the possibility that he might have. Harlan said
Virginia was very angry and dissatisfied with the Department's handling of the family's case. Harlan
thought Virginia would be minimally functional and able to care for the children. At the time Harlan
stopped seeing Virginia, she was still depressed but had made progress in being less reliant on Juan. 
Virginia told Harlan that she missed Juan but indicated that she was complying with the
Department's requirements. Harlan believed Juan and Virginia were co-dependent on each other. 
In April 1999, Harlan called the Trevino home to speak to Virginia. Juan answered and said he was
watching the children while Virginia made a trip to work. Harlan then reported a possible safety
plan violation to the Department, as required by his contract. 

 Minnie Mae Hudspeth babysat the Trevino children for about three months at the end
of 1998. She said Juan never picked up the children and the children were always in good condition. 
Hudspeth said the children were glad to see Virginia when she picked them up and she was
affectionate with them. Cindy Gray Tidwell educated Virginia about nutrition, child care, and stress
management for about six months and testified that Virginia was cooperative and seemed to
assimilate information from the training. Maria Revas babysat for C.A.T. for about three months
up until April 1999 and testified that C.A.T. always appeared healthy, well fed, cared-for, and happy
to see Virginia. Revas also testified that she had observed the entire family together before
November 1998, and that they were happy.

 Virginia's oldest daughter, J.L., testified that although Juan was not her biological
father, she called him "dad." J.L. denied that she had been alone in the house with Juan on the day
before the Department removed the children. She said her grandmother had been there. When asked
if she knew whether Juan was also there, she answered, "No, ma'am." J.L. said Juan never came
to the home when Virginia was not there. She testified that she was not afraid of Juan, he had never
hurt her, and she had never seen him hurt any of the other children.

 Virginia testified that she loved her children. She said they were a normal but not
perfect family, and she never hurt the children or saw Juan hurt them. Virginia said when she arrived
home from a week-long training session on November 6, Juan immediately asked her to look at
C.A.T.'s head. She felt a soft spot and asked her sister to drive them to the Luling hospital. The
hospital sent them home and the next day Virginia went to work. When she got home that evening,
C.A.T. seemed fine. She worked all the next day, leaving instructions with Juan that if C.A.T.
worsened he should call Virginia immediately. When she got home about 10:00 p.m., she decided
to bring C.A.T. back to the Luling hospital to ask for a CAT scan. The hospital did the scan but
"didn't know what to do with" C.A.T., so the Trevinos went home again. On Monday, Virginia
again had to work, and when she got home she asked her sister to drive them to Children's Hospital
in Austin. Virginia said Juan took C.A.T. to see two other doctors during this time frame.

 Virginia denied allowing Juan to be with the children when she was not present and
denied leaving them with him the day before they were removed. She said that day she worked until
about 2:00 p.m., picked up C.A.T. from the babysitter, and went home to make dinner and wait for
the other children to get home from school; her mother was visiting at the time. After dinner,
Virginia left her mother with the children and left to run an errand. Juan, who still had a key to the
house, was not there when she left but came while she was gone. When Virginia returned, Gwen
Lopez was waiting outside. Virginia said she refused to allow Lopez into the home because her
attorney had instructed her not to speak to the Department. When Lopez called the police and
insisted on entering the home, Virginia allowed her inside. The next day, the Department removed
the children.

 Virginia testified that she had complied with all of the Department's requirements,
including attending parenting classes, Alcoholics Anonymous meetings, and anger management
therapy. Virginia testified that she tried to reschedule two classes she missed due to conflicts with
a doctor's appointment and a job interview, but her caseworker refused. Virginia said she never saw
Juan hit D.T. with a stick, although she did see him hit her leg with a fly swatter. Virginia said she
had not filed for divorce or stopped seeing Juan because she loves him; she did not believe Juan had
injured C.A.T. However, she agreed that if only Juan's parental rights were terminated, she would
move away where Juan could not find her. Virginia testified that A.T. told a doctor that C.A.T. was
hurt when A.T. and J.T. were playing, but a Department caseworker told A.T. to stop lying.

 There was additional conflicting testimony about whether the Trevinos allowed J.L.
to socialize very late at night with a much older girl and whether Juan provided alcohol and
pornography to Donald Cagle when Cagle was a minor.


DISCUSSION


1.  Did the district court err in allowing guardian ad litem to testify?

 Virginia contends that the district court erred in allowing Van Diggele, the children's
guardian ad litem, to testify because she was not qualified as a guardian ad litem. Virginia further
contends that allowing Van Diggele's appointment as guardian ad litem violated Virginia's
constitutional rights.

 Van Diggele testified that she was a court appointed special volunteer ("CASA") and
was appointed to serve as the children's guardian ad litem. She said she was not qualified to give
an expert opinion as to the children's psychological states. Van Diggele testified that she had not
completed any state bar training, but had completed the forty-hour initial CASA training and the
yearly requirement of ten to twelve hours of continuing CASA training. She was not aware of any
other requirements that were established for guardians ad litem. Virginia objected that Van Diggele
was unqualified to testify as to the children's best interest. The court overruled the objection but
instructed the jury that Van Diggele was not an expert witness. When Van Diggele was asked how
she formulated her opinions as to the children's best interest, the court interrupted and said it would
allow her to give her opinion but would not allow her to give her reasons. See Tex. Fam. Code Ann.
§ 107.002(c)(6) (West Supp. 2002) (guardian can give reasons for guardian's opposition to proposed
order). The court reiterated that Van Diggele was not an expert, and said, "This statute is the
exception, and therefore I'm going to treat it as an exception. And I will allow her to go into what
her recommendations are. . . . But I'm not going to let you go into, 'Well, I think they would have
been better off because.'"

 In most suits to terminate a parent-child relationship, the trial court must appoint a
guardian ad litem to represent the child's interest. Id. § 107.001 (West Supp. 2002). The guardian
may be an attorney, a volunteer advocate appointed under section 107.031, or an adult with the
competence and training sufficient to represent the child's best interest. Id. § 107.001(d). The
guardian may investigate as she deems necessary to determine the child's best interest, may attend
all legal proceedings, and may review and sign or decline an agreed order related to the child. Id.
§ 107.002 (West Supp. 2002). A guardian who is not also the child's attorney ad litem may testify
as to her recommendations on what would be in the child's best interest and, if she opposes a
proposed order, may give the reasons for her opposition. Id. §§ 107.002(c)(6), (d). Before being
appointed, a prospective guardian or attorney ad litem must read, sign, and file a document listing
ad litem responsibilities. Id. § 107.006(b) (West Supp. 2002). Prospective ad litems must file a new
signed statement every two years to continue to be eligible for appointment. Id. In a suit filed by
a government entity, a trial court may appoint as guardian ad litem a volunteer advocate who has
received the court's approved training and been certified to appear as an advocate for the child. Id.
§§ 107.031(a), (d) (West Supp. 2002).

 If a Department region contains a county with more than 2.8 million people, the local
administrative district judge in each county in the region shall establish a pool from which guardians
and attorneys ad litem are appointed; in any other county, a local administrative district judge may
establish such a pool. Id. § 107.006(a) (West Supp. 2002). To be eligible for such an ad litem pool,
a prospective ad litem must (1) complete ad litem training approved by the state bar, (2) complete
at least three hours of annual continuing legal education in family law, and (3) meet other
requirements established by the local administrative district judge. Id. 

 Virginia argues that section 107.006 unconstitutionally differentiates between larger
and smaller counties because it allows for the appointment of an "unqualified" ad litem in a sparsely
populated county, such as Caldwell. When Virginia raised this objection, the district court
responded, "I think it's clear, I guess, as a matter of law that she hasn't met the recommendations
under [section 107.006 of the family code]," and then overruled the objection. (3) See id. On appeal,
Virginia argues that the statute violates her constitutional rights to equal protection under the law
by establishing different criteria for ad litems depending on the population of the county. (4) See U.S.
Const. amend. XIV, § 1.

 It is well-established that the right to equal protection is afforded to a person as such,
and territorial uniformity is not a constitutional requirement. Salsburg v. Maryland, 346 U.S. 545,
551-52 (1953); Richards v. League of United Latin Amer. Citizens, 868 S.W.2d 306, 311 (Tex.
1993); Beckendorff v. Harris-Galveston Coastal Subsidence Dist., 558 S.W.2d 75, 81 (Tex. Civ.
App.--Houston [14th Dist.] 1977, writ ref'd n.r.e.). State legislatures have wide discretion to
determine whether laws shall operate statewide or only in certain areas, bearing in mind the needs
and desires of each city or area. Salsburg, 346 U.S. at 551-52; Beckendorff, 558 S.W.2d at 81; see
Click v. State, 745 S.W.2d 480, 482 (Tex. App.--Corpus Christi 1988, pet. ref'd) (statute requiring
only larger counties to have sophisticated police equipment is constitutional). Geography is a
legitimate consideration in determining rules to impose or services to provide. See Salsburg, 346
U.S. at 553; Richards, 868 S.W.2d at 311-12; Click, 745 S.W.2d at 482; Dailey v. Wheat, 681
S.W.2d 747, 758 (Tex. App.--Houston [14th Dist.] 1984, writ ref'd n.r.e.); see also Tex. Const. art.
V, § 18 (treating large and small counties differently in rules governing election precincts, justices
of the peace, constables, and county commissioners); Tex. Gov't Code Ann. §§ 62.016, .017,
.106(a)(6), (8) (differing rules governing jury pools in large and small counties), 573.061(4) & (7)
(exception to nepotism prohibition for certain jobs in smaller counties or municipalities) (West 1998
& Supp. 2002); Tex. Elec. Code Ann. §§ 172.024, .025 (West Supp. 2002) (filing fees and petition
requirements differ by size of county). A party attacking a statute that affects one geographical area
differently than another must prove the statute is purely arbitrary and lacks any reasonable basis. 
Morey v. Doud, 354 U.S. 457, 464 (1957), overruled on other grounds by City of New Orleans v.
Dukes, 427 U.S. 297, 306 (1976); Richards, 868 S.W.2d at 311-12.

 The statute in question is rationally based to allow the State to protect the best interest
of children involved in termination proceedings. In small, more rural counties, it might be
impossible to establish a pool of volunteers qualified under section 107.006. That Van Diggele has
not completed guardian ad litem training provided by the state bar does not render her unfit or
unqualified to act as the children's guardian; she has completed at least fifty hours of training
provided by the highly respected CASA program. Virginia has not shown Van Diggele's training
is substandard or deficient in any way, nor has she shown the statute is arbitrary or unreasonable. 
We overrule her complaints related to the admissibility of Van Diggele's testimony.


2.  Sufficiency of the evidence supporting termination

 Juan argues that the Department did not prove how C.A.T.'s injury occurred and that
such a showing was necessary because of the dissimilarity between C.A.T.'s and D.T.'s injuries. He
argues that the "[D.T.] factor" must be removed from consideration and the case evaluated as a
"straightforward accidental injury to a child case with no aggravating facts." Virginia argues that
the record contains no evidence that she or the children's environment endangered the children and
that "no one actually testified that they would be concerned for the children's safety" if they were
returned to Virginia's care. Virginia also argues that the "relevant time frame" was before the
children were removed and because K.T. was removed immediately after she was born, there was
no evidence to support the termination of Virginia's rights as to this youngest child.

 On rehearing, Juan and Virginia argue that any evidence regarding violations of safety
plans related to J.L. must be disregarded in an analysis of termination under sections 161.001(1)(D)
or (E). We disagree. That Juan and Virginia violated safety plans related to J.L. is relevant under
sections 161.001(1)(D) or (E). Evidence that Juan and Virginia have disregarded court orders and
Department recommendations is relevant to the question of whether Juan and Virginia would follow
recommendations or orders intended to protect A.T., J.T., C.A.T., and K.T.

 Both Virginia and Juan downplay the evidence supporting termination. They ignore
the conflicting evidence as to whether Juan was frequently alone with the children in violation of the
safety plan, and whether Juan told other people that he intended to deceive the Department. They
also overlook testimony from experienced Department personnel who expressed concern for the
children's well-being if left in the Trevinos' care, and Cagle's testimony that Juan violated the safety
order with Virginia's knowledge and involvement, fraudulently obtained worker's compensation,
and had a sexual relationship with a sixteen-year-old neighbor.

 D.T. testified that Juan once banged her head on the floor until she passed out. 
C.A.T. also suffered head injury, the cause of which has not been satisfactorily explained. Over
time, Juan offered changing explanations of how the injury might have occurred and there was
evidence that he attempted to convince C.A.T.'s babysitter to take the blame for the injury. 
Department personnel testified that Juan had been slow to accept responsibility for D.T.'s earlier
injuries. There was conflicting testimony as to whether the Trevinos followed through with
education to improve their parenting skills. The children's guardian ad litem testified that the
children were flourishing in foster care and recommended that the Trevinos' rights be terminated.

 This is a close case. While there is evidence that the Trevinos are competent or "good
enough" parents, there is also sufficient evidence to the contrary. The evidence and inferences that
may be drawn from that evidence are sufficient to show that Juan endangered the children by his own
conduct. Likewise, the evidence is sufficient to show Virginia should have been aware that it was
unsafe to place her children in Juan's care or to allow him to be in the home with them. That
Virginia continued to be involved with Juan throughout these proceedings and refused to accept the
likelihood that Juan seriously injured C.A.T. indicates that she might in the future fail to take steps
to protect the children. Virginia's argument that there was no evidence to support termination of her
relationship with K.T. fails because it is not necessary that the injuring conduct be directed at K.T.
to terminate the parent-child relationship. See Boyd, 727 S.W.2d at 533; Leal, 25 S.W.3d at 325.

 Considering the conflicting evidence and leaving matters of credibility and demeanor
to the jury's determination, as we must, we cannot hold that the jury's findings that the Trevinos'
parental rights should be terminated are so against the great weight and preponderance of the
evidence as to be clearly unjust. See Leal, 25 S.W.3d at 325. Likewise, taking into account factors
such as Van Diggele's testimony, the children's needs, present and future dangers posed by the home
environment, the Trevinos' parenting abilities and programs available to them, and their acts or
omissions directed at the children, we cannot hold the finding that termination is in the children's
best interests to be unsupported by the evidence. See D.O., 851 S.W.2d at 355-56. We hold there
is clear and convincing evidence sufficient to support termination under sections 161.001(1)(D) or
(E) and to support a finding that such termination is in the children's best interests. See Leal, 25
S.W.3d at 325. We overrule Virginia's second and third points of error and Juan's third issue.

 Having found sufficient evidence to support termination under sections 161.001(1)(D)
or (E), we need not address the Trevinos' attacks on section 161.001(1)(O). See In re M.C.M., 57
S.W.3d at 32.


MISTRIAL

 Virginia also contends the district court erred in refusing her requests for a mistrial
due to questions asked about Juan's friend Oscar Doria, Doria's conviction for indecency with a
child, and the possible adoption of the children. Initially, we note that although Virginia contends
that the Department "violated the limine regarding Oscar Doria on more than one occasion," and
"went beyond the Court's ruling on the Motion in Limine in asking whether the children were
adoptable," a review of the motion shows that neither subject was barred by the district court's order
in limine. Nowhere does the motion refer to Doria by name, and none of the limits set forth in the
motion apply to his conviction for indecency with a child. Further, the district court denied
Virginia's request to include in the motion in limine "[a]ny testimony of the proposed adoption of
the children." We will review whether the district court should have granted Virginia's motions for
a mistrial apart from motion in limine considerations.

 Juan testified that Doria was a friend of his. The Department asked whether Doria was
in prison, and Juan said he did not know. Virginia objected that the question was irrelevant, and the
district court overruled her objection. Doria's name came up again, and the Department asked:



 Did you know that Oscar Doria was convicted of indecency --


Juan: Objection, Your Honor.


 -- with a child?


The Court: Sustained. I'll ask the jury to disregard that last comment.


Finally, the Department asked Denise Ramirez who else was at Children's Hospital when she
interviewed Virginia. Ramirez answered, "Well, Mrs. Virginia Trevino arrived with Oscar Doria
and his wife." Virginia moved for a mistrial, arguing that the Department kept bringing up Doria
in an attempt to taint the jury. The district court denied the motion, but admonished the Department
not to mention Doria again: "I'm just informing counsel that if it keeps coming up after we've got
the stink in the jury, I'm going to be considering a mistrial."

 As for testimony regarding the children's adoption, Stephanie Hofferek, a Department
supervisor, was asked about the Department's plans for the children should the Trevinos' rights be
terminated. Hofferek stated that the Department intended for the children to be adopted. When
asked, she testified that the children were adoptable; Virginia objected immediately after Hofferek's
answer and the district court sustained the objection. When the Department asked Hofferek whether
the Department would attempt to keep the children together, Virginia objected and the district court
sustained her objection. Virginia moved for a mistrial, saying


The Court's ruling on the Motion in Limine was that they could ask what the plans
were. The answer was supposed to be adoption and move on. Not go into the
details. The [Department] has crossed and violated that order forcing me to object
in front of the jury and also forcing -- allowing the jury to hear that their opinion was
that these children are adoptable. Now, we've opened this whole can of worms and
these children may not be adoptable.



The district court overruled Virginia's request for a mistrial.

 A trial court's decision on a motion for mistrial is reviewed for an abuse of discretion. 
Van Allen v. Blackledge, 35 S.W.3d 61, 63 (Tex. App.--Houston [14th Dist.] 2000, pet. denied);
Pitman v. Lightfoot, 937 S.W.2d 496, 537 (Tex. App.--San Antonio 1996, writ denied). A trial
court abuses its discretion when it acts unreasonably or arbitrarily, without reference to any guiding
principles. Beaumont Bank, N.A. v. Buller, 806 S.W.2d 223, 226 (Tex. 1991).

 Virginia complains of three questions asked during a week-long trial with more than
twenty-five witnesses. The district court sustained Virginia's objections and instructed the jury not
to consider the question regarding Doria's conviction for indecency with a child. A trial court has
the discretion to so admonish the jury in lieu of declaring a mistrial, and here the admonishment
cured any possible error in the asking of the question. See Weidner v. Sanchez, 14 S.W.3d 353, 365
(Tex. App.--Houston [14th Dist.] 2000, no pet.). Based on this record, we cannot hold that the
district court abused its discretion in refusing to grant Virginia a mistrial. We overrule Virginia's
fourth point of error and affirm the decree of termination.



 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed: February 22, 2002

Do Not Publish

1. J.L. was named in the Department's original petition, but the termination action concerning
her was severed into a separate cause and she was eventually returned to Virginia's custody.
2. Hights testified that she last babysat C.A.T. several days before Friday, November 6, 1998 ,
when her injury was discovered. However, other testimony indicated Hights babysat for C.A.T. that
Friday.
3. Virginia argues that "the trial court found as a matter of law that [Van Diggele] had not met the
qualifications of a guardian at litem, yet continued to overrule [Virginia's] objection." This is not
completely correct. The district court found that Van Diggele would not be qualified under section
107.006 if they had been in a county that fell into the mandatory ad litem pool requirements. It did
not find she was unqualified to act as an ad litem in Caldwell County. There was no showing that
Van Diggele was unqualified. To the contrary, although she has not completed training through the
state bar, she has substantial ad litem training through CASA.
4. Virginia also argues the statute violates the corollary to her right to travel, her right to stay in
one place. See Aptheker v. Secretary of State, 378 U.S. 500, 505-06 (1964) (discussing right to
travel). We do not believe the statute implicates this right, but even if it does, our analysis of her
equal protection rights also applies to her right to travel.